Marc E. Kasowitz (mkasowitz@kasowitz.com)
Michael M. Fay (mfay@kasowitz.com)
John C. Canoni (jcanoni@kasowitz.com)
Charles M. Miller (cmiller@kasowitz.com)
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| TERRA SECURITIES ASA KONKURSBO, as the Successor in Interest to TERRA SECURITIES ASA; the Municipal Corporation of BREMANGER; the Municipal Corporation of HATTFJELLDAL; the Municipal Corporation of HEMNES; the Municipal Corporation of KVINESDAL; the Municipal Corporation of NARVIK; the Municipal Corporation of RANA; and the Municipal Corporation of VIK, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| CITIGROUP, INC.; CITIGROUP GLOBAL MARKETS, INC.; and CITIGROUP ALTERNATIVE INVESTMENTS LLC, | ) ) ) ) ) |
| Defendants. | ) ) ) |

**COMPLAINT AND
JURY DEMAND**

Plaintiffs Terra Securities ASA Konkursbo, as the successor in interest to Terra Securities

ASA ("Terra"); and the Norwegian municipal corporations of Bremanger ("Bremanger"),

Hattfjelldal ("Hattfjelldal"), Hemnes ("Hemnes"), Kvinesdal ("Kvinesdal"), Narvik ("Narvik"),

Rana ("Rana"), and Vik ("Vik," and with Bremanger, Hattfjelldal, Hemnes, Kvinesdal, Narvik

and Rana, the "Municipalities," and with Terra, "Plaintiffs"), by their attorneys, Kasowitz,

Benson, Torres & Friedman LLP, as and for their complaint against Defendants Citigroup, Inc.,

Citigroup Global Markets, Inc. ("CGM New York"), and Citigroup Alternative Investments LLC

("CAI," and with Citigroup, Inc. and CGM New York, "Citigroup"), allege as follows:

## PRELIMINARY STATEMENT

1.      This is an action arising from Citigroup's egregious fraud in selling certain

securities to the Municipalities, seven Norwegian municipalities, through Terra, a Norwegian

securities brokerage firm.  In May and June 2007, Citigroup marketed and sold over $115

million in so-called "fund-linked notes" ("FLNs" or "Notes") to the Municipalities through Terra

by representing that the FLNs were safe, conservative investments.  However, in fact, the FLNs

were neither safe nor conservative:  within a few weeks, and as a result, of those sales, the

Municipalities had lost tens of millions of dollars, and by May 2008, substantially all of their

original investment was gone and Terra was in bankruptcy.

2.      Each of the Municipalities is a municipal corporation in Norway with, as

Citigroup clearly understood, significant responsibilities to its citizens.  Accordingly, the

Municipalities had no interest in risky or speculative investments, and were looking only to

obtain safe, consistent returns.  In response, Citigroup represented to Terra and the

Municipalities that the FLNs were conservative investments that would generate steady interest

payments because they were "linked" to a low risk "tender option bond" or "TOB" investment

fund that earned reliable returns through an "arbitrage opportunity" with municipal bonds (the

"Citi TOB Fund" or "Fund").  As purported proof for its representations, Citigroup, through its

affiliate, Citigroup Capital Markets, Ltd. ("CGM London"), provided charts, graphs and tables to

Terra – and then insisted that the same charts, graphs and tables be provided to the

Municipalities – purporting to demonstrate the safety and stability of the Citi TOB Fund and, in

turn, the FLNs linked to that Fund.

3.     However, Citigroup's representations were false and misleading and failed to include material information necessary for Terra and the Municipalities to assess the true risk of the FLNs. The FLNs were, in fact, extremely risky securities because, among numerous other reasons, they were linked to the Citi TOB Fund, which employed a highly leveraged investment strategy. Although the Citi TOB Fund supposedly purchased long-term municipal bonds – an investment usually viewed as conservative and safe – through the use of significant leverage, the Fund dramatically increased its risk profile.

4.     Moreover, the success of the Citi TOB Fund depended on a highly questionable hedging strategy which, unbeknownst to Terra and Municipalities, was deeply flawed. Because the value of long-term (30 year) municipal bonds can fluctuate over time, the Citi TOB Fund purported to hedge against those fluctuations with taxable interest rate swap agreements. However, for taxable rate swaps to truly hedge a nontaxable municipal bond investment, the two rates (taxable and municipal nontaxable) needed to be highly correlated: as municipal bond values dropped, the value of the hedges (*i.e.,* the taxable interest rate agreements) had to increase in a similar amount.

5.     According to Citigroup, this correlation was near perfect. In materials prepared by CGM New York and/or CAI, and provided to Terra and the Municipalities through CGM London, Citigroup touted that from 1996 to 2006, the correlation between long-term municipal bond rates and "LIBOR" (the London Interbank Offered Rate) swap rates was virtually perfect, with a factor of almost .97 out of a possible 1. In statistics, such a high rate of correlation is exceedingly rare.

6.     However, Citigroup's correlation representations were blatantly false and misleading. First, in its statistical calculations, Citigroup incorrectly compared *levels* of interest

rates, and not *rates of change* in those rates, and thereby generated a much higher correlation

than was warranted. (For example, if a LIBOR rate had increased from 5 to 6 percent, and a

municipal rate from 4 to 5 percent, Citigroup's methodology would have focused on the fact that

the levels of increase were the same (one percent increase each), and would have ignored the

critical fact that the rates of change were different, or 20 percent and 25 percent, respectively.)

Second, Citigroup's analysis was corrupted by statistical flaws that rendered it completely

unreliable. Third, the standard error of Citigroup's analysis was unreasonably high; the larger

the standard error, the worse the predictive ability of the analysis for managing the risk of the

investment strategy.

       7.     An accurate correlation analysis of long-term municipal and LIBOR swap rates

over the 1996 to 2006 period using the municipal benchmark that Citigroup chose shows a

significantly lower (and thus far more risky) result than the almost .97 touted by Citigroup,

namely .562 out of a possible 1. Moreover, if a different, widely accepted, municipal

benchmark is used, the correlation drops to as low as .27. Further, even these low levels of

correlation were deteriorating rapidly in the more recent and therefore more relevant years of

2005, 2006 and 2007. Citigroup buried essential data for 2005 and 2006 in the numbers for the

prior nine years, and omitted data for 2007 altogether.

       8.     The true, much lower correlation rate meant the FLNs were actually much riskier

than Citigroup represented, because the Citi TOB Fund was susceptible to unhedged or poorly

hedged fluctuations in its asset value that – because of the Fund's significant leverage – could

wipe out its investors. In fact, after the FLNs purchased by the Municipalities began to fail,

Citigroup revealed for the first time to Terra and the Municipalities data that: (a) showed

significant volatility in the value of the Citi TOB Fund's assets, and (b) demonstrated that under

certain of the FLNs, the Municipalities had as much as a 62 percent chance of losing a significant portion of their investment or, at Citigroup's election, paying in additional capital to prevent the recognition of that loss. If Citigroup's earlier correlation representations had been correct, such volatility would not have occurred, because any drop in the value of the Fund's municipal bonds would have been made up by an increase in the value of the LIBOR swap agreements, and vice versa. In short, Citigroup grossly misrepresented the risk inherent in the FLNs.

9.      Citigroup also misrepresented the nature of the FLNs themselves. Citigroup convinced Terra and the Municipalities that by investing in the FLNs, they were, in essence, standing in the shoes of actual investors in the Citi TOB Fund, with a "highly experienced team" of expert managers working to maximize returns. However, the Citi TOB Fund was apparently a "benchmark," or simulated, portfolio with no real assets or managers. Further, Citigroup failed to disclose to Terra and the Municipalities other critical information, including the nature of the assets (real or virtual) in the Citi TOB Fund, the manner in which Citigroup valued the FLNs and any putative investment in the Fund, and how Citigroup's unilateral devaluation of the Citi TOB Fund and other collateral could lead to additional demands for payment under some of the FLNs.

10.     Clearly, as credit markets began to deteriorate, Citigroup sold the FLNs to Terra and the Municipalities in order to unload what was becoming significant risk from either its own or its preferred customers' balance sheets. In fact, the FLNs, as derivative instruments, operated effectively as credit insurance on TOB or municipal bond positions, with the Municipalities as the insurers and Citigroup as the insured. Citigroup's misrepresentations to Terra and the Municipalities occurred at a time when disruptions in the credit markets were becoming apparent to highly sophisticated and knowledgeable market participants like Citigroup (and unlike Plaintiffs), and the demand for such credit insurance was high. Clearly, Citigroup was

5

motivated, and had the opportunity, to sell the FLNs to the Municipalities through Terra so that it could insure itself cheaply against what were becoming increasingly risky TOB or municipal bond positions. Moreover, through its unilateral control of the valuation of the FLNs and the Citi TOB Fund, Citigroup – in a blatant conflict of interest – could ensure that it got paid insurance proceeds from the Municipalities whenever it wanted such proceeds.

11.    By August 2007, the FLNs were – according to Citigroup – deteriorating in value, and within a few months, the Municipalities had lost most of their investment in those Notes and were making claims against Terra for their losses. The impact on the Municipalities was devastating: basic municipal services, including schools, libraries, hospitals, social services, grants to culture and homes for the elderly suffered greatly. Indeed, one municipality, Narvik, was forced, among other things, to disconnect road and street lighting during night hours. Needless to say, for a municipality located above the polar circle with very limited daylight in the wintertime, such a measure is draconian. In addition, one media source reported that in Hattfjelldal, Narvik, Rana and Hemnes, the losses amounted to over $990 for every man, woman and child living in those Municipalities.

12.    Further, Terra's involvement in the sale of the FLNs to the Municipalities led to its ultimate bankruptcy and the loss of its significant enterprise value. The Municipalities would have never purchased, and Terra would have never assisted the Municipalities in purchasing, the FLNs if they had known the truth about those Notes and the Citi TOB Fund.

13.    In fact, the Citi TOB Fund was not an arbitrage opportunity, as Citigroup represented to Terra and the Municipalities. An arbitrage connotes a low risk strategy for taking advantage of pricing discrepancies in markets, usually in the form of simultaneous investments in similar assets or the purchase and resale of assets in different markets. The Citi TOB Fund

involved simultaneous investments in two very different assets which resulted in significant risk to the investor: the arbitrage "spreads" that Citigroup claimed the Fund would take advantage of were actually a reflection of very real differences in risk between taxable and nontaxable investments. Nonetheless, Citigroup hid the risks inherent in the FLNs from Terra and the Municipalities so that it could profit from the *de facto* insurance policies built into those Notes.

14.    Terra and the Municipalities have been directly injured by the fraudulent misconduct of Citigroup and are entitled to recover damages for their losses, which exceed $200 million, as well as punitive damages

## PARTIES

15.    Plaintiff Terra Securities ASA Konkursbo is a corporation (with registration no. 992 028 920) that was, under Norwegian law, automatically formed at the time of the bankruptcy filing of Terra Securities ASA (a corporation with registration no. 979 561 296) on November 28, 2007. Terra Securities ASA Konkursbo, although a corporation distinct from Terra Securities ASA, possesses and controls all assets of Terra Securities ASA, including the causes of action alleged herein. Also on November 28, 2007, Jon Skjørshammer, a Norwegian citizen, was appointed to be the administrator of Terra Securities ASA Konkursbo by the Norwegian Bankruptcy Court in Oslo, Norway (Oslo Byfogdembete). As used herein, "Terra" refers to both Terra Securities ASA Konkursbo since its incorporation and Terra Securities ASA prior to its bankruptcy.

16.    Plaintiff Bremanger is a city and municipal corporation in Norway.

17.    Plaintiff Hattfjelldal is a city and municipal corporation in Norway.

18.    Plaintiff Hemnes is a city and municipal corporation in Norway.

19.    Plaintiff Kvinesdal is a city and municipal corporation in Norway.

20.    Plaintiff Narvik is a city and municipal corporation in Norway.

21.    Plaintiff Rana is a city and municipal corporation in Norway.

22.    Plaintiff Vik is a city and municipal corporation in Norway.

23.    Defendant Citigroup, Inc. is, upon information and belief, a corporation organized under the laws of Delaware with its principal place of business in New York, New York

24.    Defendant CGM New York is, upon information and belief, a corporation organized under the laws of Delaware with its principal place of business in New York, New York. CGM New York is the securities and brokerage arm of Citigroup, Inc. and, upon information and belief, with CAI, was the originator of the FLNs and the Citi TOB Fund.

25.    Defendant CAI is, upon information and belief, a limited liability company organized under the laws of Delaware with its principal place of business in New York, New York. CAI is listed as the investment manager for the Citi TOB Fund.

26.    Non-party CGM London is, upon information and belief, a corporation organized under the laws of England with its principal place of business in London. CGM London had a distributor agreement with Terra and passed on documents and information to Terra that it received from CGM New York and/or CAI.

## JURISDICTION AND VENUE

27.    This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1367.

28.    Venue is proper in this district pursuant to 15 U.S.C. § 78aa, because the defendants transact business in this district, and pursuant to 28 U.S.C. § 1391, because at least one defendant resides in this district.

## FACTS

### I.     The Citi TOB Fund

29.     Beginning in or about April 2007, Citigroup, through CGM London, provided Terra with materials regarding the FLNs and the Citi TOB Fund for the express purpose of having the Notes marketed specifically to the Municipalities. The FLNs – which were linked to the Citi TOB Fund and were arranged by Citigroup – were issued by two different entities, Starling Finance P.L.C. ("Starling") and Banque AIG, and in three series known as "Starling 12," "Starling 13" and "Banque AIG." Terra, a small securities firm with less than 75 employees, had little experience with derivative instruments like the FLNs and relied completely on Citigroup for information regarding the Notes.

30.     The materials provided to Terra for the Municipalities regarding the Citi TOB Fund were prepared in New York by employees of CGM New York and/or CAI and then provided to Terra by CGM London. The principal presentation provided to Terra was a PowerPoint entitled "Citigroup Municipal Investors:  TOB Capital Municipal Portfolio" (the "Presentation"). Citigroup provided the Presentation to Terra with full knowledge and the intention that the information contained therein would then be provided to the Municipalities. *Indeed, Citigroup, through CGM London, insisted that Terra provide the Presentation to the Municipalities,* and Terra did so at Citigroup's insistence.

31.     The Presentation speaks glowingly about the Citi TOB Fund, stating that it would be managed by a "[h]ighly experienced team spinning out of Citigroup's proprietary municipal bond trading desk" that would invest in the "exceptional credit quality of municipal bonds." Citigroup emphasized the safety of municipal bonds, using such terms as "Low Default Rate," "Highly Rated Bonds," "No Historical Defaults" and "High Recovery Rate."   Citigroup also

represented that it would be investing up to $250 million of its own money in the Citi TOB Fund and related funds, and thereby provided further inducement for the Municipalities to invest.

32.    The Presentation then explained the basic TOB fund strategy: an "arbitrage opportunity" which sought to take advantage of the "steepness" of the long-term municipal curve (*i.e.,* the spread between long-term and short term rates). Specifically, Citigroup stated that "although "[t]heoretically, AAA municipal yields should trade at 65% of the LIBOR swap curve (1-35% tax rate)," long-term municipal yields paid more, closer to 77 percent of that rate. Citigroup further represented that this "arbitrage" – *i.e.,* the net amount long-term municipal bonds pay over the cost of lending short term – was consistent over time. The Citi TOB Fund would simply collect, and distribute to investors, that net amount. Of course, Citigroup failed to mention that this arbitrage spread between long-term municipal rates and short-term rates was at historic lows in May and June 2007, just when it was marketing the FLNs to Terra and the Municipalities.

33.    However, whatever the value of this arbitrage spread, the Citi TOB Fund posed a fundamental risk for any investor: the highly leveraged structure of the Fund made it vulnerable to fluctuations in municipal bond values. For example, in a TOB fund leveraged 9 to 1, even a 10 percent drop in the value of the fund's bond holdings could wipe out investors.

34.    Accordingly, on page 12 of the Presentation, Citigroup addressed the most critical issue with respect to any investment in, or linked to, the Citi TOB Fund: its hedging strategy. The Citi TOB Fund supposedly hedged against a drop in municipal bond values with LIBOR swap agreements that traded a fixed interest rate for a floating rate. The idea was that if the long-term municipal bonds dropped in value, the swap agreements would increase in value by an equal amount, keeping the market value of the Fund stable.

35.     However, hedging municipal bonds with interest rate swaps assumes that the value of municipal bonds is largely governed by movements in interest rates. To convince Terra and the Municipalities that this assumption was true, Citigroup stated that "[t]he correlation between municipal rates and LIBOR has been strong over time" and included charts purporting to demonstrate that municipal bond and LIBOR swap rates are highly correlated.

36.     In the field of statistical analysis, correlation is measured by the "$R^2$" value of two datasets. The Presentation contained a graph plotting data from 1996 to 2006 for a 30-year municipal bond benchmark versus a 30-year LIBOR benchmark that generated an $R^2$ value of .9689, a near perfect correlation (with 1 being perfect):



Citigroup further represented that this correlation held even during periods of economic downturn when interest rates can become inverted (*i.e.,* short term instruments pay more than long-term instruments).

37.     Unbeknownst to Terra and the Municipalities, however, Citigroup's near perfect statistics were hopelessly flawed. First, statistics provide meaningful predictions only if the correct variables are measured and analyzed. In what can only be described as an egregious error in its analysis, Citigroup's statistical model focused on the relationship between *levels* of

11

municipal and LIBOR interest rates. As any reasonable statistician would have known, however, the critical issue was the relationship between *rates of change* in those interest rates. Citigroup, by intentionally or recklessly focusing on levels and not changes, masked significant risk to the investor.

38.     Second, under fundamental rules of statistics, Citigroup's analysis had to comply with various assumptions in order to be valid. However, two critical statistical assumptions, namely a lack of "autocorrelation" and "heteroscedasticity," were violated in Citigroup's statistical model. Autocorrelation is the correlation of a dataset with itself. Heteroscedasticity occurs when the variance in data is not constant. Citigroup's statistical analysis provided meaningful results only if it was free of both autocorrelation and heteroscedasticity, which it was not. Because of this corruption, Citigroup's model misrepresented the relationship between taxable and nontaxable interest rates and, hence, the risk of the investment strategy to the investor.

39.     Third, in its Presentation, Citigroup failed to set forth a standard error for its statistical analysis, but when its analysis is replicated, that error value is disturbingly high. Standard error is a measure of the accuracy of a statistical prediction: *i.e.,* what are the chances the prediction will prove to be wrong. The higher the standard error, the more likely that the statistical presentation will prove wrong, and thus the greater the risk to the investor.

40.     In the end, if Citigroup's statistical analysis had been performed correctly, it would have yielded an $R^2$ factor of no more than .562, with a much lower factor for the more critical years of 2005, 2006 and 2007. An $R^2$ factor of .562 means that almost 44 percent of the variance in long-term municipal bond rates cannot be explained by movements in taxable interest rates. Further, if Citigroup's selected municipal bond index (Thomson Financial) is changed to

another commonly used index (Bloomberg), the $R^2$ factor drops to .27. Citigroup's statisticians certainly knew that the high correlation they were touting did not exist, and that the FLNs were therefore much riskier than Citigroup represented.

41.    In fact, after the FLNs had lost significant value, Citigroup provided data to Terra that flatly contradicted its claimed high correlation. In late 2007 or 2008, CGM New York and/or CAI employees prepared additional materials for Terra and the Municipalities. These materials, entitled "Citigroup Municipal Investors: Customer-Requested Information for Terra," contained confusing information about the Citi TOB Fund, much of it "pro forma," or simulated. However, one graph, showing the Fund's putative mark-to-market valuation from 2000 to 2007, was startling. Over that period, the graph showed the Citi TOB Fund suffering significant asset value volatility, something that should not have occurred if long-term municipal and LIBOR swap rates were highly correlated. In fact, that data showed that from 2000 to 2007, the value of an investment in the Citi TOB Fund would have dropped by 10 or more percent six times. Such a graph was never shown to Terra or the Municipalities prior to the Municipalities' purchase of the FLNs.

42.    Although the Presentation noted the possibility of "dislocations" in the municipal/LIBOR interest rate correlation, Citigroup bragged that these dislocations provided "relative value opportunities for skilled asset managers." Put another way, even where the municipal/LIBOR correlation proved momentarily weak, Citigroup's managers somehow knew how to use those events to generate additional returns for investors. The Presentation then discussed examples of these "value opportunities" and how its managers would purportedly turn these opportunities into "enhance[d] returns."

13

43.    The Presentation did not discuss the assets the Citi TOB Fund would actually contain, or the form of the swap agreements it would use for hedging purposes. The Presentation also contained nothing about how Citigroup would value the Citi TOB Fund's assets or an investment in the Fund. Further, the Presentation all but ignored the fragility of the TOB Funds' financing: the "arbitrage opportunity" only worked if the Fund issued *very* short term notes, which notes usually could be put back to the Fund every seven days or so. If the short term debt market dried up, the Citi TOB Fund was in trouble. Since the FLNs were long-term, illiquid Notes, the vulnerability of this short term market was a significant risk.

44.    In addition, the Citi TOB Fund apparently was not an actual investment fund. The Citi TOB Fund is registered as an investment fund in Ireland; however, Terra and the Municipalities were never provided with any actual performance data for the Fund, and Terra was later informed by Citigroup that it was a "benchmark portfolio." Benchmark portfolios generally are simulated portfolios, *i.e.,* computer programs driven off indices and not actual investments. Although there appeared to be an actual fund related to the Citi TOB Fund, known as the "TOB Capital Offshore Series 2006-5" fund ("TOB Offshore"), the relationship of this fund to the Citi TOB Fund was never fully explained. Indeed, the FLNs were specifically linked to the "TOB Capital Municipal Portfolio, Series 2007-07IN" issuance, but neither Terra nor the Municipalities have ever been provided with evidence that such an issuance existed. Indeed, the additional data that Citigroup provided to Terra and the Municipalities in late 2007 or 2008 was only "pro forma" (*i.e.,* simulated) Citi TOB Fund data that was supplemented with TOB Offshore data, and nothing as to any Series 2007-07IN. Most significantly, Terra and the Municipalities were never provided with any data suggesting that Citigroup invested any of the promised $250 million in the Citi TOB Fund or related funds.

14

45.     Finally, the Presentation contained nothing about a very significant risk factor:
credit risk – *i.e.,* the risk that borrowers may become less creditworthy.  Municipal bonds are
subject to credit risk, both related to the municipalities themselves and their insurers.  Most
municipal debt offerings are insured by "monoline" companies like Ambac Financial Group,
Inc., MBIA Inc. and Financial Guaranty Insurance Corp.  If these insurers falter, pricing on
municipal bonds can be impacted.  The Presentation made no reference to this significant risk
factor, even though it was a risk that could *not* be effectively hedged with interest rate swap
agreements.  Indeed, the Presentation contained only boilerplate risk factors that lacked the
specificity necessary to make them meaningful.

46.     In fact, the Presentation contains a glaring omission regarding credit risk.
Citigroup spent three pages of the Presentation explaining how the spread between municipal
bond and LIBOR swap rates could be explained by investor preference.  According to Citigroup,
investors like short-term municipal issuances, but municipalities like the security of long-term
notes.  Thus, the glut of long-term municipal notes leads to higher yields on those notes.
However, Citigroup never discussed the likely explanation for this investor preference:  the very
real credit risk associated with long-term municipal investments.

47.     Citigroup actually intensified this credit risk for certain of the FLNs.  For the
Starling 12 and 13 FLNs, the collateral for the Municipalities' investment was collateralized
debt obligations ("CDOs") linked to the creditworthiness of numerous corporate enterprises.
These CDOs contained triggers that could result in significant losses if the creditworthiness of
the referenced enterprises fell. This double dose of credit risk (long-term municipal bonds and
credit-linked CDOs) in a highly leveraged structure was deadly:  in any circumstance where
investors were fleeing investments with credit risk, both the value of the CDOs *and* the value of

the Citi TOB Fund would fall. Since the Starling FLNs had no hedging mechanism for credit risk, the loss of value under the FLNs would be significant. While Citigroup provided extensive analysis complete with charts, graphs and tables aimed at convincing Terra and the Municipalities that the FLNs were safe and reliable, Citigroup provided no analysis whatsoever of the extraordinary credit risk that arose from a structure built on both CDOs and long-term municipal bonds.

48.     Indeed, this risk is once again confirmed by the data Citigroup provided to Terra and the Municipalities in late 2007 or 2008. For example, as to the Starling 13 FLNs, using Citigroup's 2000-2007 data as an indicator of asset value volatility, the risk that the Municipalities holding those Notes would lose their investment or have to pay in additional capital solely because of a devaluation of the Citi TOB Fund was as high as 38 percent. Assuming a ten percent drop in the CDO collateral as well, the risk rises to as much as 62 percent. As to the Starling 12 FLNs, these percentages were slightly better (28 and 50 percent, respectively) given the shorter term of those Notes, but the risk was still ridiculously high. These extraordinary risks existed whether an economic downturn subsequently occurred or not.

49.     For all this risk, the Municipalities earned a paltry sum: a base rate of NIBOR (the Norwegian Interbank Offered Rate) plus two percent, or, for example, approximately 6.83 percent in the first week of July 2007.

## II.     The FLNs

### A.     Banque AIG

50.     On or about May 23, 2007, Bremanger, Kvinesdal and Vik invested a nominal amount of NOK (Norwegian Krones) 243 million, or approximately $40 million, in 10-year FLNs issued by Banque AIG. Citigroup arranged the Banque AIG FLNs and, through CGM London, provided these Municipalities with all information and documentation regarding those

FLNs. The term sheet for Banque AIG stated that the purpose of the FLNs was to "[p]rovide an investor with . . . an indirect exposure to the USD denominated shares issued by TOB Capital Municipal Portfolio . . . ."

51.    The FLNs provided that Bremanger, Kvinesdal and Vik would receive interest payments (NIBOR plus two percent) through a "total return swap" agreement ("TRS") between Banque AIG and CGM London, with Citigroup, Inc. as CGM London's guarantor. In addition, a hypothetical reserve account ("Reserve Account") was created with 5 percent of the initial investment proceeds. This Reserve Account was meant to collect all returns that an actual investor in the Citi TOB Fund would receive; additional amounts would then be paid to Bremanger, Kvinesdal and Vik from that Account. However, the Reserve Account also served as credit protection for Citigroup: if the value of the Citi TOB Fund fell, Citigroup was authorized to declare various events of discontinuance, or other adjustment events (including triggers built into the Reserve Account itself), which allowed it to reset the Reserve Account so that the nominal amount of the Municipalities' initial investment in the Banque AIG FLNs was reduced, freeing up investment monies to act as insurance proceeds to Citigroup.

52.    In short, through Citigroup's unilateral control of the Reserve Account, Citigroup could cause the Banque AIG FLNs to act as insurance for Citigroup. Citigroup also took hefty issuance and placement fees out of the Reserve Account, and a 20 percent success fee from all distributions to the Reserve Account above a pre-determined amount.

53.    Terra, Bremanger, Kvinesdal and Vik were not provided with any information regarding the holdings of the Citi TOB Fund, or how Citigroup valued the assets of that Fund. Further, the only information that Citigroup provided to Terra, Bremanger, Kvinesdal and Vik

regarding the municipal/LIBOR swap rate correlation risk was the misleading analysis set forth in the Presentation by CGM New York and/or CAI.

**B.    Starling 12**

54.    On or about June 27, 2007, Hattfjelldal, Hemnes and Rana invested a nominal amount of NOK 339 million, or approximately $57 million, in + 6½ year FLNs issued by Starling, in an issuance referred to as Starling 12. Citigroup arranged the transaction and, through CGM London, provided the Municipalities with all information and documentation regarding the Starling 12 FLNs. Rather than providing cash for their investment, Hattfjelldal, Hemnes and Rana put up their prior investment in a synthetic CDO that Citigroup had marketed to them in 2006 (the "Libretto CDO"). The term sheet for Starling 12 stated that "[t]he Notes performance is linked to the Collateral [*i.e.,* Libretto CDO] and the Total Return Swap on the Reference Fund [*i.e.,* the TOB Capital Municipal Portfolio, Series 2007-07IN]."

55.    Like the Banque AIG FLNs, the Starling 12 FLNs provided that Hattfjelldal, Hemnes and Rana would receive interest payments (NIBOR plus two percent) through the terms of a TRS, and Citigroup, Inc. once again served as CGM London's guarantor on that TRS. In addition, a Reserve Account was created with 5 percent of the initial investment proceeds. This Reserve Account was meant to collect all returns that an actual investor in the Citi TOB Fund would receive and, as with the Banque AIG FLNs, additional distributions were to be made from those amounts. However, like the Banque AIG FLNs, if the value of the Citi TOB Fund fell, Citigroup was authorized to declare various events of discontinuance, or other adjustment events (including triggers built into the Reserve Account itself), which allowed it to reset the Reserve Account and free up investment monies to act as insurance proceeds to Citigroup. Citigroup also took issuance and placement fees and a 20 percent success fee from all distributions to the Reserve Account above a pre-determined amount.

56.     Most significantly, however, the Starling 12 FLNs also contained punitive trigger mechanisms that gave Citigroup an easy way to seize the Municipalities' investment. If, according to Citigroup, the value of the Libretto CDO and/or the TRS (which was linked to the Citi TOB Fund) fell to a pre-determined trigger amount, Citigroup could terminate the TRS (or, as it later chose to do, voluntarily accept additional collateral in lieu of termination from Hattfjelldal, Hemnes and Rana). Thus, through Citigroup's unilateral control of the valuation of the Libretto CDO *and* the valuation of the Citi TOB Fund, Citigroup could cause the FLNs to act as insurance for Citigroup.

57.     Hattfjelldal, Hemnes and Rana were never provided with any information regarding the holdings of the Citi TOB Fund, or how Citigroup valued the assets of that Fund. Further, the only information that Citigroup provided to Hattfjelldal, Hemnes and Rana regarding the municipal/LIBOR swap rate correlation risk was the misleading analysis set forth in the Presentation prepared by CGM New York and/or CAI. Moreover, Citigroup provided insufficient detail regarding the possibility that additional collateral payments might be requested. Indeed, Citigroup was silent on a significant risk factor that was very likely to require such additional payments: both the CDOs and the Citi TOB Fund – the two valuation components built into the trigger mechanisms for the Starling 12 FLNs – were subject to unhedged credit risk.

**C.      Starling 13**

58.     On or about June 27, 2007, Hattfjelldal and Narvik invested a nominal amount of NOK 112,734,200 million, or approximately $19 million, in + 7½ year FLNs issued by Starling, in an issuance referred to as Starling 13. Citigroup arranged the transaction and provided these Municipalities, through Terra, with all information and documentation regarding the Starling 13 FLNs. Rather than providing cash for their investment, Hattfjelldal and Narvik put up their prior

investment in a Libretto CDO. Like the Starling 12 term sheet, the term sheet for Starling 13 states that the Notes' performance was linked to both the Libretto CDO and the TRS on the Citi TOB Fund.

59.    The Starling 13 FLNs worked just like the Starling 12 FLNs, providing Hattfjelldal and Narvik with interest at a rate of NIBOR plus two percent under the TRS (which was guaranteed by Citigroup, Inc.), but allowing Citigroup to terminate the TRS, or request additional collateral in lieu of termination, if the value of the Libretto CDO or an investment in the Citi TOB Fund fell to pre-determined levels. Thus, as with the Starling 12 and Banque AIG FLNs, through Citigroup's unilateral control and valuation, Citigroup could cause the Starling 13 FLNs to act as insurance for Citigroup. Further, Citigroup once again concealed the enormous credit risk of combining the CDOs and a TRS linked to the Citi TOB Fund in the FLNs' trigger mechanism, and the significant chance that Hattfjelldal and Narvik would lose their investment or be compelled to pay in additional collateral because of that risk.

## III.  Citigroup's Misrepresentations Lead To Enormous Losses For Terra And The Municipalities

### A.  The Dramatic Divergence Of Municipal And Taxable Rates

60.    Within six weeks of the Municipalities' purchase of the FLNs, Citigroup's representations regarding the high correlation between municipal and LIBOR rates were proven demonstrably false, and those rates began to dramatically diverge. Although the United States economy would soon enter a downturn, according to Citigroup's representations, economic downturns should not have had an impact on the municipal/LIBOR swap rate correlation or the performance of the Citi TOB Funds. As Citigroup had represented in its Presentation, the correlation supposedly held during good times as well as bad.

61.     Nonetheless, as the rates diverged, the value of the Citi TOB Fund's assets fell. Municipal bond yields increased – because of perceived credit risk – causing the value of long-term municipal bonds to fall.  If Citigroup had been right, however, yields should have also increased on taxable investments, and the Fund's swap agreements would have increased in value to offset the loss on the municipal bonds.  However, yields actually fell on taxable instruments, as investors worried about credit risk moved into safer investments, like U.S. Treasury securities.  For the Citi TOB Fund, that meant both of its assets (long-term municipal bonds and the LIBOR swap agreements) fell in value.

62.     On August 17, 2007, CGM London contacted Terra to notify it that a termination trigger had occurred under the Starling 13 FLNs.  CGM London stated that the TRS "with the TOB Capital" was "down from inception to today" by 25 percent.  In other words, Citigroup, through CGM London, was representing that through its own valuation process, an investment in the Citi TOB Fund had lost one fourth of its value in just six weeks; this loss of value, combined with Citigroup's unilateral devaluation of the Libretto CDO, purportedly gave Citigroup the right to terminate the TRS and liquidate the Starling 13 FLNs.  Also on August 17, CGM London notified Terra that an identical termination trigger had occurred with respect to the Starling 12 FLNs.

63.     On August 24, CGM London once again contacted Terra regarding the Starling FLNs, explaining that the "[TOB] Fund is down and [Libretto CDO] collateral is up."  In one week, Citigroup's calculated value of an investment in the Citi TOB Fund had dropped by an additional 6 percent, to 31 percent.

64.     And just four days later, CGM London informed Terra that an investment in the Citi TOB Fund had dropped yet again, now by a total of 35.8 percent.  Thus, in less than two

months, an investment in the Fund to which the FLNs were linked, according to Citigroup, had lost over one-third of its value.

65.     In an October 2007 email, Citigroup, through CGM London, conceded that its devaluations were due to the divergence of taxable and nontaxable rates: "[t]he Muni fund was down last week mainly because of the rally in Treasuries given the flight to quality on the back of Merrill news." According to Citigroup's earlier representations, given the purported tight correlation between municipal and taxable rates, a rally in U.S. Treasuries should not have materially affected the value of assets in the Citi TOB Fund. However, as Citigroup knew when it initially marketed the Notes to Terra and the Municipalities, that tight correlation did not exist, as the events of the fall of 2007 demonstrated. Credit risk associated with long-term municipal bond investments was pushing the value of those investments down, and thus pushing their yields up, even where yields on taxable investments (*e.g.*, U.S. Treasuries) were falling.

66.     In order to avoid termination and a forced sale of the Starling FLNs, Citigroup "allowed" Hattfjelldal, Hemnes, Narvik and Rana to post NOK 100 million, or over $16 million, in additional collateral with Citigroup. Nonetheless, by November 2007, the Starling FLNs had triggered again, and Citigroup was requesting additional collateral that the Municipalities could not afford to pay. Accordingly, in December 2007, Citigroup sold the Starling FLNs in a forced sale, and returned to Hattfjelldal, Hemnes, Narvik and Rana only 17 percent of their original investment. In five months, these Municipalities had lost over 83 percent of their initial investment – more than NOK 374 million, or approximately $63 million.

67.     Bremanger, Kvinesdal and Vik – the investors in the Banque AIG FLNs – fared little better. These Municipalities watched the value of their investment in the Banque AIG FLNs drop precipitously throughout the latter half of 2007 and into the first quarter of 2008.

Ultimately, at Terra and the Municipalities' request, Citigroup sold the Banque AIG FLNs in May 2008, returning to Bremanger, Kvinesdal and Vik only 33 percent of their original investment. In just over nine months, these Municipalities had lost 67 percent of their initial investment – more than NOK 162 million, or approximately $27 million.

68.     Where the Municipalities lost, Citigroup gained. The FLNs had always been a win-win for Citigroup: hefty fees if things went well, insurance proceeds if things went poorly. Once again, the Municipalities had been nothing more than insurers to Citigroup, which as the insured, reaped enormous benefits if its representations, including the correlation misrepresentations in the Presentation, proved false. Most egregiously, unlike a typical insured, Citigroup controlled the entire process by which it unilaterally determined, through an unknown and undisclosed valuation process, that it was entitled to significant insurance proceeds. Further, Citigroup misled its insurers, the Municipalities, by utilizing faulty statistical data that made extraordinarily risky investments look safe and secure. Citigroup, as one of the largest and most respected financial institutions in the world, and the packager and marketer of the FLNs, clearly had the opportunity to sell these misleading securities to Terra and the Municipalities. Further, Citigroup had a very real motive: sensing the coming turmoil in credit markets, and knowing that the correlation of municipal and taxable rates was not as high as it was representing, Citigroup wanted to buy insurance on TOB or municipal bond strategies. And what better insurer than unsuspecting cities and towns in Norway.

## B.     Citigroup's Misrepresentations Lead To The Collapse Of Terra

69.     As a result of the Municipalities' losses, Norway's Financial Supervisory Agency launched an investigation of Terra. As a result of that investigation, Terra ceased operations and was forced into bankruptcy, leading to the loss of Terra's considerable enterprise value, which

was in excess of NOK 1,460 million, or over $230 million, based on discounted cash flow analyses. Terra also suffered additional costs and losses as a result of Citigroup's misconduct.

70.    Terra and all of the Municipalities have incurred significant losses as a result of, and are entitled to recover those losses from, Citigroup.

## IV.    Citigroup New York's Involvement and Contacts with Terra

71.    Throughout its relationship with Citigroup, Terra had numerous contacts with Citigroup's New York office. As noted, that New York office structured the FLN transactions, prepared the marketing materials provided to Terra and the Municipalities (including the Presentation), managed the putative Citi TOB Fund and thus, was the location from which the fraud against Terra and the Municipalities was perpetrated.

72.    Further, when Citigroup marketed the Libretto CDOs to the Municipalities in September 2006, Terra representatives traveled to New York for a meeting with Citigroup New York employees. In January 2007, Terra again traveled to New York to meet with Citigroup representatives.

73.    Citigroup's New York office also hosted investor conference calls in which Terra representatives were invited to participate, including a March 2007 market update call discussing, among other things, sub-prime mortgages. Later that same month, Terra also participated in a call with the head of Citigroup New York's synthetic structuring. On or about April 24, 2007, Terra representatives participated in a call with Craig Henick, the purported portfolio manager for the Citi TOB Fund and, upon information and belief, an employee of CAI, to discuss the Fund. Terra relied upon Henick and sought his advice on the Citi TOB Fund. For example, in an email dated June 13, 2007, forwarded by CGM London to Terra, Henick explained the status of the municipal bond market at that time.

74. In August 2007, when the value of the FLNs was collapsing (at least according to Citigroup), Terra immediately requested a meeting with Henick. In response, in both September and October 2007, Terra representatives met in New York with Henick, among others.

75. In addition, payments made on the FLNs were overseen by Citigroup's New York office. For example, on or about June 29, 2007, Citigroup's New York office emailed Terra to inquire about expected payments and information required for the transfer of those payments. Further, as of October 2007, market update reports prepared by Citigroup's New York office were being sent to Terra monthly.

76. Finally, the valuations on the Libretto CDOs and the TRSs associated with the FLNs were calculated by Citigroup's New York office. For example, in a November 8, 2007 email, Terra requested that CGM London send valuations for the TRS associated with the Banque AIG FLNs, and CGM London responded that Terra would have to wait "for the numbers from N.Y."

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Against CGM New York and CAI for Violations of Section 10(b) of the Securities & Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder)

77. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 76, inclusive, of this Complaint as though set forth fully herein.

78. CGM New York and CAI intentionally and/or recklessly: (a) employed a device, scheme and artifice to defraud Terra and the Municipalities with respect to the sale of the FLNs; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading; and/or (c) engaged in acts, practices or courses of business which operated as a fraud and deceit upon Terra and the Municipalities in connection

with the sale and purchase of the FLNs in May and June 2007 in violation of Section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. §78i(b)) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.  Terra, the Municipalities or both Terra and the Municipalities purchased the FLNs.

79.    CGM New York and CAI engaged in a series of fraudulent and deceitful acts or practices, including:  (a) the dissemination of materials to Terra and the Municipalities which contained (i) false and misleading statements, including but not limited to the blatant misstatements about the safety of the FLNs and the purported high correlation of municipal and taxable interest rates, and (ii) material omissions of fact, including but not limited to the actual lack of correlation between municipal and taxable rates, the significant volatility in the pro forma asset value of the Citi TOB Fund during periods for which Citigroup later provided data to Terra and the Municipalities, and the extraordinary risk that the Municipalities investing in the Starling FLNs would have to pay in additional collateral; (b) the failure to disclose the true nature of the Citi TOB Fund; and (c) preparing, publishing and distributing false and misleading financial and marketing materials as set forth above.

80.    CGM New York and CAI had the motive and opportunity to mislead Terra and the Municipalities with respect to the Municipalities' purchase of the FLNs.  CGM New York and CAI's motive was to obtain insurance on TOB or municipal bond positions, since market turbulence in the summer of 2007 indicated to sophisticated market participants, like CGM New York and CAI, that municipal and taxable rates were likely to diverge in the near future.  CGM New York and CAI, as part of one of the world's largest banks and a trusted arranger and/or originator of investment securities, clearly also had the opportunity to mislead and sell the FLNs to Terra and Municipalities.

81.    Further, CGM New York and CAI, either intentionally or recklessly, provided Terra and the Municipalities with erroneous financial data even though they had access to information suggesting that the data was incorrect. CGM New York and CAI, either intentionally or recklessly, failed to correct the misleading statements in the materials provided to Terra and the Municipalities, including the Presentation.

82.    Terra and the Municipalities reasonably relied upon the financial information and other representations of CGM New York and CAI in deciding to purchase the FLNs for the Municipalities. Had Terra and the Municipalities known that the information they received from CGM New York and CAI contained material misrepresentations, or had they known the material adverse information which was concealed by CGM New York and CAI, the Municipalities would not have purchased the FLNs and Terra would not have assisted the Municipalities in purchasing those Notes. Terra and the Municipalities have suffered significant damages as a result of CGM New York and CAI's material misrepresentations and omissions.

83.    By reason of the foregoing, Plaintiffs are entitled to a judgment against CGM New York and CAI, jointly and severally, for compensatory damages in an amount to be determined at trial, but in excess of $200 million.

## SECOND CAUSE OF ACTION

**(Against Citigroup, Inc. for Control Person
Liability under Section 20(a) of the Exchange Act)**

84.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 83, inclusive, of this Complaint as though set forth fully herein.

85.    Citigroup, Inc., as the sole ultimate shareholder of CGM New York and CAI, possessed the power to direct or cause the direction of the management and policies of CGM New York and CAI, exercised control over the operations of CGM New York and CAI and

possessed the power to control CGM New York and CAI in the perpetration of the fraud on Terra and the Municipalities in order to reduce losses on TOB or municipal bond positions.

86.    Indeed, Citigroup, Inc. had the same motive as CGM New York and CAI to mislead Terra and the Municipalities: the FLNs provided insurance on the TOB positions of Citigroup, Inc., wherever those positions were held in the entire Citigroup, Inc. enterprise. To this end, Citigroup, Inc.: (a) allowed fraudulent materials to be sent to Terra and the Municipalities bearing the name "Citigroup," as well as the Citigroup, Inc. logo; and (b) acted as the guarantor on the TRSs.

87.    Accordingly, under Section 20(a) of the Exchange Act, Citigroup, Inc. is liable for CGM New York and CAI's conduct in intentionally and/or recklessly: (a) employing a device, scheme and artifice to defraud Terra and the Municipalities with respect to the sale of the FLNs; (b) making untrue statements of material fact or omitting to state material facts necessary in order to make the statements made not misleading; and/or (c) engaging in acts, practices or courses of business which operated as a fraud and deceit upon Terra and the Municipalities in connection with the sale and purchase of the FLNs in violation of Section 10(b) of the Exchange Act (15 U.S.C. §78i(b)), and Rule 10b-5 promulgated thereunder.

88.    By reason of the foregoing, Terra and the Municipalities have suffered significant damages and are entitled to a judgment against Citigroup, Inc. for compensatory damages in an amount to be determined at trial, but in excess of $200 million.

### THIRD CAUSE OF ACTION

### (Against CGM New York and CAI for Fraud)

89.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 88, inclusive, of this Complaint as though set forth fully herein.

90.    CGM New York and CAI intentionally or recklessly made numerous false and misleading statements of material fact regarding the FLNs to Terra and the Municipalities, including but not limited to their blatant misstatements about the safety of those FLNs and the purported high correlation of municipal and taxable interest rates.

91.    CGM New York and CAI intentionally or recklessly also failed to disclose material information known only to them and specifically not known to Terra or the Municipalities, including but not limited to the actual lack of correlation between municipal and taxable rates, the significant volatility in the pro forma asset value of the Citi TOB Fund during periods for which Citigroup later provided data to Terra and the Municipalities, and the extraordinary risk that the Municipalities investing in the Starling FLNs would have to pay in additional collateral. CGM New York and CAI were under a duty to disclose such information because: (a) of their superior knowledge as financial advisors to Terra and the Municipalities (and the special relationship that arose from their superior knowledge), as well as their unique and specialized expertise with respect to the FLNs; (b) the absence of disclosure rendered prior statements by CGM New York and CAI misleading; and (c) the information was critical to Terra and Municipalities' decision to enter into the FLN transactions.

92.    CGM New York and CAI made the material misrepresentations, and omitted to disclose the material facts herein alleged, with the intention of inducing: (a) the Municipalities to agree to purchase the FLNs, and (b) Terra to assist in those purchases. Terra and the Municipalities reasonably and justifiably relied on those misrepresentations and omissions in agreeing to purchase the FLNs for the Municipalities.

93.    Terra and the Municipalities have been damaged by CGM New York and CAI's intentional or reckless misconduct. CGM New York and CAI's fraudulent conduct, as alleged

herein, was outrageous, willful and wanton, and perpetrated with an evil motive and a reckless indifference to the rights of Terra and the Municipalities.

94.     By reason of the foregoing, Plaintiffs are entitled to a judgment against CGM New York and CAI, jointly and severally, for compensatory and punitive damages in an amount to be determined at the trial, but in excess of $200 million.

## FOURTH CAUSE OF ACTION

### (Against CGM New York and CAI for Negligent Misrepresentation)

95.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 94, inclusive, of this Complaint as though set forth fully herein.

96.     CGM New York and CAI intentionally, recklessly, negligently or carelessly made numerous false and misleading statements of material fact to Terra and the Municipalities, including but not limited to their blatant misstatements about the safety of the FLNs and the purported high correlation of municipal and taxable interest rates. CGM New York and CAI made these misrepresentations with the intention that they be directly relied upon by Terra and the Municipalities, and with the knowledge that Terra and the Municipalities would act upon those misrepresentations.

97.     CGM New York and CAI intentionally, recklessly, negligently or carelessly also failed to disclose material information known only to them and specifically not known to Terra or the Municipalities, including but not limited to the actual lack of correlation between municipal and taxable rates, the significant volatility in the pro forma asset value of the Citi TOB Fund during periods for which Citigroup later provided data to the Municipalities, and the extraordinary risk that the Municipalities investing in the Starling FLNs would have to pay in additional collateral. CGM New York and CAI were under a duty to disclose such information because: (a) of their superior knowledge as financial advisors to Terra and the Municipalities

30

(and the special relationship that arose from their superior knowledge), as well as their unique and specialized expertise with respect to the FLNs; (b) the absence of disclosure rendered prior statements by CGM New York and CAI misleading; and (c) the information was critical to Terra and Municipalities' decision to enter into the FLN transactions.

98.     CGM New York and CAI made the material misrepresentations, and omitted to disclose the material facts herein alleged, with the intention of inducing:  (a) the Municipalities to agree to purchase the FLNs, and (b) Terra to assist in those purchases.  Terra and the Municipalities did reasonably and justifiably rely on those misrepresentations and omissions in agreeing to purchase the FLNs for the Municipalities.  Terra and the Municipalities have been damaged by CGM New York and CAI's intentional, reckless, negligent or careless misconduct.

99.     By reason of the foregoing, Plaintiffs are entitled to a judgment against CGM New York and CAI, jointly and severally, for compensatory damages in an amount to be determined at trial, but in excess of $200 million.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

A.     On the First Cause of Action, directing CGM New York and CAI to pay, jointly and severally, compensatory damages to Plaintiffs in an amount to be determined at trial, but in excess of $200 million;

B.     On the Second Cause of Action, directing Citigroup, Inc. to pay compensatory damages to Plaintiffs in an amount to be determined at trial, but in excess of $200 million;

C.     On the Third Cause of Action, directing CGM New York and CAI to pay, jointly and severally, compensatory damages to Plaintiffs in an amount to be determined at trial, but in excess of $200 million, and punitive damages in an amount to be determined at trial;

D.     On the Fourth Cause of Action, directing CGM New York and CAI, jointly and severally, to pay compensatory damages to Plaintiffs in an amount to be determined at trial, but in excess of $200 million;

E.     Awarding Plaintiffs the costs of prosecuting this action, including reasonable attorneys' fees, and pre- and post-judgment interest at the rate allowed by law; and

F.     Granting Plaintiffs such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues triable to a jury.

DATED:  August 10, 2009

Respectfully submitted,

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By:_____
      Marc E. Kasowitz (mkasowitz@kasowitz.com)
      Michael M. Fay (mfay@kasowitz.com)
      John C. Canoni (jcanoni@kasowitz.com)
      Charles M. Miller (cmiller@kasowitz.com)

1633 Broadway
New York, NY 10019
(212) 506-1700

Attorneys for Plaintiffs