UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
TERRA SECURITIES ASA KONKURSBO,        :
ET AL.,
                        Plaintiffs,    :      09 Civ. 7058 (VM)
                                       :
       - against -                     :      **DECISION AND ORDER**
                                       :
CITIGROUP, INC., ET AL.,               :
                                       :
                        Defendants.    :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiffs Terra Securities ASA Konkursbo ("Terra") and seven Norwegian municipalities -- Bremanger, Hattfjelldal, Hemnes, Kvinesdal, Narvik, Rana and Vik (the "Municipalities") -- (collectively, "Plaintiffs") filed a complaint in this action, dated August 10, 2009 (the "Complaint"), naming as defendants Citigroup, Inc. ("Citigroup"), Citigroup Global Markets, Inc. ("CGM New York") and Citigroup Alternative Investments LLC ("CAI") (collectively, "Defendants"). Plaintiffs assert securities fraud claims under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) ("§ 10(b)"), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as well as common law fraud and negligent misrepresentation claims. Defendants now move to dismiss Plaintiffs' claims, asserting that the Court lacks subject matter jurisdiction pursuant to Federal Rule of Civil

Procedure 12(b)(1) ("Rule 12(b)(1)") or, alternatively, that New York is not a convenient forum for the litigation of this matter.[1]

For the reasons stated below, Defendants' motion to dismiss is DENIED.

## I. BACKGROUND[2]

In May and June of 2007, Defendants sold over $115 million in securities to the Municipalities through Terra, a Norwegian securities firm. The securities constituted notes linked to the Citi Tender Option Bond Fund (the "Fund"), a Cayman Island fund managed by CAI, a unit of CGM New York. Plaintiffs assert that the fund-linked notes ("FLNs") were structured and arranged by CGM New York and managed by CAI,

---

[1]   The Court received a letter from Defendants, dated October 7, 2009 ("Defs.' Oct. 7 Letter"), asserting jurisdictional and forum non conveniens deficiencies in Plaintiffs' claims. The Court deemed the Defs.' Oct. 7 Letter as Defendants' motion to dismiss for lack of subject matter jurisdiction and for forum non conveniens.

[2]   This factual background is derived from the Complaint and documents attached thereto, referenced therein or integral to its drafting, as well a chart entitled "Origin of Various Documents," to which the parties stipulated for the purposes of this motion to dismiss. In deciding a motion to dismiss under Rule 12(b)(1), the Court may consider these documents. See Wetzel v. Town of Orangetown, No. 06 Civ. 5144, 2007 WL 3009999, at *4 (S.D.N.Y. Oct. 12, 2007); Faggionato v. Lerner, 500 F. Supp. 2d 237, 243 (S.D.N.Y. 2007); Miller v. Lazard, Ltd., 473 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) (citing Chambers v. Time Warner, 282 F.3d 147, 152-53 (2d Cir. 2002)).   "A court confronted with a jurisdictional controversy may consider evidence outside the pleadings." City of Edinburgh Council v. Vodafone Group Pub. Co., No. 07 Civ. 9921, 2008 WL 5062669, at *4 (S.D.N.Y. Nov. 24, 2008) (citing Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998)).   Unless specifically referenced, no further citation to these sources will be made.

-2-

and the FLNs were issued by two different European entities, Starling Finance P.L.C. and Banque AIG, for trading on the Irish Stock Exchange.

Beginning in or about April 2007, Defendants marketed the FLNs to the Municipalities. Plaintiffs allege that Defendants, through its affiliate Citigroup Capital Markets, Ltd. ("CGM London"), materially misrepresented that the FLNs were safe, conservative investments. Plaintiffs point primarily to a presentation entitled "Citigroup Municipal Investors: TOB Capital Municipal Portfolio" ("Presentation I"), prepared by CGM New York in New York, and distributed to Terra for presentation to the Municipalities by CGM London or another Europe-based Citigroup entity.[3] Presentation I contains the CAI logo on every page, represents that two New York-based Citigroup employees, Craig Henick ("Henick") and Edward Sun, are the "Senior Portfolio Managers" of the Fund, and states that the Fund would be managed by a "highly experienced team spinning out of Citigroup's proprietary municipal bond trading desk to establish a fund within CAI." (Complaint ¶ 31; Declaration of Jon E. Skjørshammer

---

[3] The parties dispute whether CGM London or a Netherlands affiliate of Citigroup ultimately distributed Presentation I to Terra. (Compare Defs.' Oct. 7 Letter at 2, and Declaration of Peter Arnold in Support of Defendants' Motion to Dismiss, dated October 21, 2009 ("Arnold Decl."), ¶ 10, with Plaintiffs' Reply Letter, dated October 28, 2009, at 2.)

("Skjørshammer"), dated October 14, 2009 ("Skjørshammer
Decl."), Ex. D.)  Plaintiffs assert that Defendants insisted
that Terra provide Presentation I to the Municipalities and
that Terra did so at their insistence.

Presentation I marketed the Fund to municipal investors
by describing the Fund's investment strategy, detailing its
structure, and purporting to demonstrate the historical
performance of municipal yields hedged with interest rate swap
agreements.  Presentation I described the Fund's investment
strategy as an arbitrage opportunity for investors, whereby
the Fund takes advantage of the relative steepness of the
long-term municipal yield curve -- the spread between long-
term and short-term rates on municipal bonds.  Specifically,
Presentation I represented that the net amount long-term
municipal bonds pay over the cost of lending short term (the
"Arbitrage") was consistent over time.  The Arbitrage would
accumulate in the Fund and be distributed to investors.

Plaintiffs assert that the Fund, no matter the value of
the Arbitrage, posed a risk for any investor and thus
Defendants also used Presentation I to explain the Fund's
hedging strategy.  Presentation I explained how the Fund
hedged against a drop in municipal bond values with interest
rate swap agreements.  Defendants represented that if the

-4-

long-term municipal bonds dropped in value, the swap
agreements would increase in value by an equal amount, thereby
keeping the market value of the Fund stable.  To market this
hedging strategy, Presentation I contained graphs
demonstrating the historically strong relationship between
municipal bond rates and the London Interbank Offered Rate
("LIBOR"), the benchmark rate used for the interest rate swap
agreements.  Presentation I represented that the municipal
bond and LIBOR rates had a near perfect correlation and that
this correlation held even during periods of economic
downturn, when short-term instruments typically pay more than
long-term instruments.

Plaintiffs allege that Defendants' representations in
Presentation I regarding the historically high correlation
between municipal and LIBOR rates were material misstatements
upon which they relied in deciding to invest in the FLNs.
Plaintiffs contend that Defendants intentionally or recklessly
focused on the relationship between levels of municipal and
LIBOR interest rates instead of on the rates of change in
those interest rates, and also ignored fundamental rules of
statistical analysis.  Defendants thereby misrepresented the
statistical relationship between the rates and the riskiness
of investment in the FLNs.

-5-

Within a few months after the Municipalities invested in the FLNs, the FLNs lost significant value.  In August 2007, when the value of the FLNs was collapsing, Terra requested a meeting with Henick.  In September and October 2007, Terra representatives met with Henick, among others, in New York.

Further, in late 2007 or 2008, CGM New York prepared a presentation addressing information requested by Terra entitled "Citigroup Municipal Investors, Customer-Requested Information for Terra" ("Presentation II").  Plaintiffs assert that Presentation II revealed that, prior to Plaintiffs' investment in the FLNs, Defendants had fraudulently withheld information showing the Fund's pro forma mark-to-market valuation from 2000 to 2007.  Presentation II contained a graph showing the Fund's putative mark-to-market valuation before the Fund's inception in May 2006.  The graph showed that the Fund would have suffered significant asset-value volatility over that time period, and Plaintiffs allege that this variation should not have occurred if the municipal and LIBOR rates were as highly correlated as represented in Presentation I.  Plaintiffs assert that based on the data contained in Presentation II, the value of an investment in the Fund would have dropped by ten or more percent on six occasions between 2000 to 2007.

Plaintiffs acknowledge that Presentation I included the caveat that municipal bonds may underperform or outperform LIBOR hedges for several reasons and thus cause mark-to-market volatility, but nonetheless assert that Presentation I misrepresented the risk inherent in a Fund investment. Plaintiffs rely on the following statement, which directly followed the caveat described above: "These dislocations can cause mark-to-market volatility in a hedged municipal position, but they can also present relative value opportunities for skilled value managers." (Complaint ¶ 42.) Plaintiffs allege that Defendants' failure to provide an accurate portrayal of the pro forma mark-to-market volatility of the Fund prior to their investment in the FLNs constituted a material omission of fact.

Lastly, Plaintiffs allege that Presentation I fraudulently omitted the credit risk inherent in an FLN investment. Plaintiffs assert that municipal bonds are subject to credit risk, both related to the performance of the municipalities themselves and the possibility that the insurers of municipal debt offerings falter. Because Presentation I contains only boilerplate risk factors, Plaintiffs assert that Defendants also materially misrepresented this risk component of investment in the FLNs.

-7-

## II. **DISCUSSION**

A.   SUBJECT MATTER JURISDICTION

In reviewing the motion to dismiss, the Court will first address grounds that challenge its subject matter jurisdiction because, absent authority to adjudicate, the Court lacks a legal basis to grant any relief, or even consider the action further.   See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2008); Can v. United States, 14 F.3d 160, 162 n.1 (2d Cir. 1994) ("[I]n most instances the question whether a court has subject-matter jurisdiction is, conventionally and properly, the first question a court is called on to consider.").

1.   Legal Standard

The inquiry on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) concerns whether the district court has the statutory or constitutional power to adjudicate the case.   See Makarova, 201 F.3d at 113. "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."   Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998).   "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."

-8-

Makarova, 201 F.3d at 113.  The preliminary showing that must
be made by the plaintiff, however, is not meant to be overly
burdensome, "allowing for subject matter jurisdiction so long
as the 'the federal claim is colorable.'"  Cromer Fin. v.
Berger, 137 F. Supp. 2d 452, 467 (S.D.N.Y. 2001) (quoting
Savoie v. Merchants Bank, 84 F.3d 52, 57 (2d Cir. 1996)); see
also Europe and Overseas Commodity Traders, S.A. v. Banque
Paribas London, 147 F.3d 118, 121 n.1 (2d Cir. 1998) ("[A]
plaintiff ... should not be deprived of its day in an American
court by a Rule 12(b)(1) order based on erroneous facts ....
In a close case, the factual basis for a court's subject
matter jurisdiction may remain an issue through trial, and, if
and when doubts are resolved against jurisdiction, warrant
dismissal at that time." (citations and quotations omitted)).
As noted above, in reviewing a motion to dismiss for lack of
subject matter jurisdiction, a court may consider evidence
outside the pleadings.  See Banque Paribas, 147 F.3d at 121
n.1.

Although the Exchange Act is silent as to its
extraterritorial application, federal courts have exercised
subject matter jurisdiction over claims "implicating
transnational securities fraud."  City of Edinburgh Council,
2008 WL 5062669, at *2 (citing SEC v. Berger, 322 F.3d 187,

192 (2d Cir. 2003)). Courts tasked with determining whether subject matter jurisdiction exists for transnational securities law claims must consider "whether Congress would have wished the precious resources of the United State courts ... to be devoted to such transactions." Morrison v. National Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008), cert. granted, 2009 WL 4111014, at *1 (Nov. 30, 2009) (quotations and citations omitted). Specifically, courts in the Second Circuit engage in two inquiries to determine whether a district court may exercise subject matter jurisdiction over the claims of foreign plaintiffs arising out of transnational securities transactions: (1) whether the wrongful conduct occurred in the United States (the "Conduct Test"), or (2) whether the wrongful conduct, even if it occurred in a foreign country, had a substantial adverse effect in the United States or upon United States citizens (the "Effects Test"). See Berger, 322 F.3d at 192 (citations omitted). A plaintiff need only satisfy either the Conduct or the Effects Test to support a finding of subject matter jurisdiction. See Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1045 (2d Cir. 1983).

   2.   Application

Plaintiffs bring this action for securities fraud, alleging that Defendants fraudulently misrepresented the

-10-

investment risk involved in the FLNs.  Defendants move to
dismiss Plaintiffs' claims, arguing that the Court lacks
subject matter jurisdiction because Plaintiffs assert claims
based on losses allegedly incurred in Norway, on securities
arranged by a British bank, issued by Irish and French
corporations and registered on an Irish exchange.  Plaintiffs
counter that Defendants' fraudulent statements that gave rise
to this action were prepared in New York and thus satisfy the
Conduct Test.[4]

The seminal formulation of the Conduct Test applicable in
the Second Circuit is that enunciated in Bersch v. Drexel
Firestone, Inc., 519 F.2d 974 (2d Cir. 1975).  The Second
Circuit declared that the antifraud provisions of the federal
securities laws "[d]o not apply to losses from sales of
securities to foreigners outside the United States unless the
acts (or culpable failures to act) within the United States

---

[4] The parties agree that the Effects Test is not applicable to the Court's
determination of subject matter jurisdiction.  As noted above, under the
Effects Test, "a federal court has jurisdiction ... where illegal activity
abroad causes a substantial effect within the United States."  Euro Trade
& Forfaiting, Inc. v. Vowell, No. 00 Civ. 8431, 2002 WL 500672, at *6
(S.D.N.Y. Mar. 29, 2002) (citing Alfadda v. Fenn, 935 F.2d 475, 478 (2d
Cir. 1991)).  "The effects test concerns the impact of overseas activity
on U.S. investors and securities traded on U.S. securities exchanges,"
Banque Paribas, 147 F.3d at 128 n.12, and it has no bearing in an action
involving the claims of foreign purchasers of foreign securities on
foreign exchanges, such as is the case presented here.  The Court will
therefore apply only the Conduct Test to determine whether it has
jurisdiction.

directly caused such losses." Bersch, 519 F.2d at 993. Emerging from Bersch is a two-step analysis consistently employed by courts in this Circuit applying the Conduct Test. See, e.g., In re NovaGold Res., Inc. Sec. Litig., 629 F. Supp. 2d 272, 305 (S.D.N.Y. 2009); Euro Trade, 2002 WL 500672, at *7; Interbrew v. Edperbrascan Corp., 23 F. Supp. 2d 425, 430 (S.D.N.Y. 1998). First, the conduct alleged must be more than "merely preparatory" to a securities fraud conducted elsewhere. Itoba Ltd. v. Lep Group PLC, 54 F.3d 118, 122 (2d Cir. 1995). Second, the "activities or culpable failures to act in the United States must have directly caused the claimed losses." Id. Inherent in the Conduct Test is the principle that Congress did not want "the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." Id. (citing Psimenos, 722 F.2d at 1045).

The considerations enunciated in Bersch, though still routinely applied, have been recast over the years to address the myriad permutations and combinations of parties, places, timing and conduct that arise out of transnational securities fraud cases. See In re Alstom SA Sec. Litig., 406 F. Supp. 2d 346, 371-73, 374 n.17 ("Several other district courts have pronounced the standard for the conduct test in terms that may

-12-

be broadly read as variations on the Bersch theme."). The Bersch doctrine has evolved to account for various considerations, including (1) the conduct in question in relation to plaintiff's theory of fraud; (2) the location of the relevant conduct; (3) the timeline of relevant acts; (4) the materiality or substantiality of the relevant conduct; (5) the causal connection between the domestic conduct and the alleged losses; and (6) considerations of "reasonableness gauged by the intent of congressional policy and principles of fairness in the circumstances surrounding the particular case." Id. at 375-76; see also Tabor v. Bodisen Biotech, Inc., 581 F. Supp. 2d 552, 558-63 (S.D.N.Y. 2008). But none of these considerations are meant to be weighed independently of the others; rather they must be considered in conjunction, and no particular consideration is dispositive. See IIT, an Int'l Inv. Trust v. Cornfeld, 619 F.2d 909, 918 (2d Cir. 1980) ("It should be evident by now that the presence or absence of any single factor which was considered significant in other cases dealing with the question of federal jurisdiction ... is not necessarily dispositive in future cases" (quotations omitted)). Further, despite nuanced applications of the Conduct Test, the primary inquiry remains the two-part determination articulated in Bersch, consisting of (1) whether

-13-

the alleged domestic acts constitute the core of the alleged fraud, and (2) whether the acts directly caused the plaintiff's alleged losses. See Morrison, 547 F.3d at 173 ("To clear up any confusion, we reiterate that our 'conduct test' requires that 'the defendant's conduct in the United States be more than merely preparatory to the fraud, and [that] particular acts or culpable failures to act within the United States directly cause[] losses to foreign investors abroad' for subject matter jurisdiction to exist.") (quoting Alfadda v. Fenn, 935 F.2d 475, 478 (2d Cir. 1991)); see also Banque Paribas, 147 F.3d at 128-29.

a.   The Heart of the Alleged Fraud Occurred in New York

A court determining its own subject matter jurisdiction must first analyze "what conduct comprises the heart of the alleged fraud." Morrison, 547 F.3d at 175. "This determination is made by enumerating and situating, according to place of occurrence, the pertinent material acts that, combined, constitute the alleged fraudulent scheme." O'Mahony v. Accenture, 537 F. Supp. 2d 506, 513 (S.D.N.Y. 2008). If the acts that occurred in the United States are "merely secondary to the core acts of the fraud," they will not satisfy the conduct test. City of Edinburgh Council, 2008 WL 5062669, at *3 (citing Banque Paribas, 147 F.3d at 128-29).

-14-

The Court will therefore analyze the submissions of the parties to determine whether Plaintiffs have shown by sufficient evidence that the heart of the fraud at issue in this action took place in the United States.

Defendants argue that, as in <u>Bersch</u>, the limited United States conduct identified by Plaintiffs was, at most, "merely preparatory and therefore cannot form the basis for subject matter jurisdiction." (Defs.' Oct. 7 Letter at 7.) Defendants assert that the essential core of the alleged fraud necessarily took place in Europe because the relevant transactions were negotiated and executed in Europe, the FLNs were issued in Europe, and the vast majority of communications occurred between Plaintiffs and CGM London. (<u>See</u> Arnold Decl. ¶¶ 4-12.) The Court disagrees. While Defendants are correct that conduct far removed from the consummation of the fraud will not suffice to establish jurisdiction, <u>see</u> <u>Psimenos</u>, 722 F.2d at 1046, the fraudulent misrepresentations and omissions alleged by Plaintiffs that constitute the fraud at issue specifically involve conduct undertaken in New York.

The parties have stipulated that Presentation I, which contains a majority of the alleged misrepresentations underlying Plaintiffs' securities fraud claims, was prepared by Defendants in New York. (<u>See</u> Origin of Various Documents

-15-

at 1-2.)  On this basis, in part, the Court is persuaded that the fraud alleged, taken as true, had its center of gravity in New York.

In essence, Plaintiffs allege that the Fund marketing strategy was concocted by CGM New York and CAI, both New York-based Citigroup entities, and that the strategy, replete with misinformation, misrepresentations and fraudulent omissions, was memorialized by Defendants in New York for transmission to potential investors.  Any actions taken by CGM London or other Europe-based Citigroup entities to disseminate Presentation I and thus produce the losses claimed here arose directly from or were merely ancillary to Defendants' conduct in New York. See Morrison, 547 F.3d at 174 (discussing Cromer, 137 F. Supp. 2d at 480, and stating "[t]he critical factor was that the conduct that directly caused loss to investors -- the creation of the fraudulent statements -- occurred in New York.")

The chain of events and center of alleged fraudulent conduct at issue here are substantially analogous to the fact pattern addressed in Cromer.  See 137 F. Supp. 2d 452.  There, the Court found it had subject matter jurisdiction in an action brought by foreign investors arising out of investments in an off-shore fund.  See id. ("[A]lthough the named Plaintiffs are foreign citizens, and the Fund operated as an

-16-

offshore-fund, the fraud was run from the United States and it was the decisions made in the United States that led directly to the investors' losses.")  The defendant investment manager had allegedly prepared fraudulent account statements in New York that vastly overstated the market value of an off-shore fund.   The investment manager then sent the fraudulent statements to the fund administrator in Bermuda and directed him to distribute the statements to potential investors.   As Defendants argue here, the investment manager in Cromer argued against subject matter jurisdiction under the Conduct Test because his actions in New York, even if true, did not directly cause the plaintiffs' losses because of intermediary steps taken to disseminate the information in Bermuda.   The Court rejected the defendant investment manager's argument and denied his motion to dismiss for lack of subject matter jurisdiction. See Cromer, 137 F. Supp. 2d at 480-81; see also Berger, 322 F.3d at 195 ("Although the statements that ultimately conveyed the fraudulent information to investors were prepared and mailed in Bermuda, the preparation and mailing of these inaccurate statements was not itself fraudulent: The Fund Administrator was simply acting under

-17-

[the defendant's] instruction ... to distribute false information that he had already fraudulently concocted in the United States.")

The Court is persuaded that here, as in <u>Cromer</u>, the essential core of the alleged fraud occurred in New York. The Defendants concocted and implemented their allegedly fraudulent marketing strategy in New York. Irrespective of whether CGM London or another Citigroup entity ultimately disseminated Presentation I to Plaintiffs, Defendants' conduct occurring in New York constituted substantial acts committed in furtherance of the alleged fraud. See <u>Psimenos</u>, 722 F.2d at 1045 ("foreign plaintiffs' suits under anti-fraud provisions of the securities laws would be heard only when substantial acts in furtherance of the fraud were committed in the United States").

The chain of events and center of conduct in question here, as in <u>Cromer</u>, can be distinguished from the circumstances presented in other notable transnational securities fraud cases where the Second Circuit declined to find subject matter jurisdiction because the conduct in the United States was merely preparatory. See, <u>e.g.</u>, <u>Morrison</u>, 547 F.3d at 176; <u>Bersch</u>, 519 F.2d at 987. In <u>Bersch</u>, parts of an allegedly fraudulent prospectus were drafted in New York

-18-

and read over the telephone to a defendant corporation's main office in Switzerland.   The Second Circuit declined to find jurisdiction over foreign plaintiffs' securities fraud claims arising out of defendants' New York-based contribution to the prospectus because "the fraud itself consisted of the delivery of the fraudulent prospectus to investors and the final prospectus emanated from foreign sources." Morrison, 547 F.3d at 173 (citing Bersch, 519 F.2d at 987).

Similarly, in Morrison, the Circuit Court reversed the district court's finding of subject matter jurisdiction where a defendant allegedly manipulated data in Florida and transmitted the false data to Australia, where it was compiled and prepared for dissemination.   The Second Circuit concluded that there was no subject matter jurisdiction, finding that the actions taken and not taken by the defendant in Australia were "significantly more central to the fraud and more directly responsible for the harm to investors than the manipulation of the numbers in Florida." Id. at 176.

By contrast, here, unlike in Morrison and Bersch, Defendants' alleged conduct in New York, if true, would represent the heart of the alleged fraud.   Concocting a fraudulent marketing strategy and knowingly memorializing it in Presentation I for distribution by others abroad is

-19-

significantly   more   culpable   than   CGM   London's   mere
distribution   of   Presentation   I,   without   any   substantive
changes,   to   potential   investors.     The   Court   is   thus   not
persuaded   that   Defendants'   conduct   in   New   York   was   merely
preparatory   to   the   fraud.     Rather,   the   Court   finds   that
Defendants' conduct occurring in New York involved substantial
acts committed in furtherance of the alleged fraud.

      b.    **Plaintiffs Have Sufficiently Pled a Direct Causal
           Causation**

When   reviewing   for   subject   matter   jurisdiction   in   a
transnational   securities   fraud   case,   identification   of   the
heart   of   the   fraud   is   followed   by   analysis   of   whether   the
domestic   conduct   directly   caused   the   alleged   losses.     As
articulated in Bersch, the United States antifraud securities
laws apply only to an alleged foreign fraudulent scheme if
there is a sufficient connection between substantial domestic
conduct and the consequential financial losses the plaintiff
asserts.     See,   e.g.,   Bersch,   519 F.2d at 993;   In re Parmalat
Sec. Litig., 497 F. Supp. 2d 526, 531 (S.D.N.Y. 2007);   In re
Alstom, 406 F. Supp. 2d at 381.

Defendants assert that Plaintiffs have failed to allege
that "the disclosure of the supposed misinformation led to
their loss."   (Defendants Letter in Support of Deemed Motion

-20-

to Dismiss, dated October 21, 2009 ("Defs.' Oct. 21 Letter"),
at 5.) Defendants urge the Court to apply the loss causation
pleading standard set forth in Dura Pharmaceuticals, Inc. v.
Broudo, 544 U.S. 336, 342-46 (2005) to this jurisdictional
inquiry. But the Defendants misstate the applicable causation
standard. At this stage in the proceedings, the Court need
not determine whether disclosure of the alleged
misrepresentations caused the Plaintiffs' losses. For the
purpose of exercising subject matter jurisdiction, the Court
need only determine whether the alleged fraud was an essential
link in the chain of events culminating in the alleged fraud.
See Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d
1326, 1335 (2d Cir. 1972) (finding that an alleged
misrepresentation was an "essential link" to the consummation
of the transnational securities fraud). In other words, the
injury asserted must be a direct result or reasonably probable
consequence of the act or omission in question, and the
alleged domestic conduct must have constituted a substantial
factor or significant contributing cause in bringing about the
alleged harm. See In re Alstom, 406 F. Supp. 2d at 381.

The Court finds that Plaintiffs have pleaded sufficient
facts alleging that Defendants' New York-based conduct was an
essential link in the consummation of the alleged fraud at

-21-

issue here.  Plaintiffs' have sufficiently pled that their
alleged losses were a direct result or reasonably probable
consequence of Defendants' alleged misrepresentations.  As
noted above, in this jurisdictional analysis, the Court must
determine only whether Plaintiffs have made out a colorable
claim of securities fraud based on a center of conduct located
in the United States.  See, e.g., Cromer, 137 F. Supp. 2d at
467; Savoie, 84 F.3d at 57; Banque Paribas, 147 F.3d at 121
n.1.  The Municipalities have alleged that the dramatic
divergence of the municipal and LIBOR rates shortly following
their investment in the FLNs, in striking contrast to the
representations contained in Presentation I, was the direct
cause of their losses.  (See Complaint ¶¶ 60-68.)  Terra has
similarly pled that its bankruptcy, resulting from the
Municipalities' failed investment, was a reasonably probable
consequence of Defendants' alleged fraud.  (See id. ¶ 70.)
The Court therefore finds that Plaintiffs have made out a
colorable claim of securities fraud arising out of Defendants'
allegedly fraudulent conduct in New York.

Accordingly, the Court finds that the Conduct Test is
satisfied and Defendants' motion to dismiss on grounds of
subject matter jurisdiction is denied.

-22-

B.    FORUM NON CONVENIENS

Defendants also move to dismiss Plaintiffs' complaint on forum non conveniens grounds.  Courts in this Circuit employ a three-part test to analyze the application of forum non coveniens.  See Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 154 (2d Cir. 2005); Iragorri v. United Techs. Corp., 274 F.3d 65, 73-74 (2d Cir. 2001) (en banc).  The Court first determines the degree of deference that should be accorded the plaintiff's choice of forum.    See  Norex Petroleum, 416 at 153-54.  Second, the court considers whether there exists an adequate and available alternative forum where the dispute could be adjudicated.    See  Piper Aircraft v. Reyno, 454 U.S. 235, 254 n.22 (1981); Gulf Oil v. Gilbert, 330 U.S. 501, 506-07 (1947).  Finally, the court assesses the appropriateness of litigating the action in the plaintiff's choice of forum, as opposed to any alternative venue, by balancing the private interests of the litigants and the public interest concerns of the court in accordance with the factors articulated by the Supreme Court in Gilbert.  See Gilbert, 330 U.S. at 508-09; Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukr., 311 F.3d 488, 500 (2d Cir. 2002); Turedi v. Coca Cola Co., 460 F. Supp. 2d 507, 521 (S.D.N.Y. 2006), aff'd, 343 Fed. Appx. 623 (2d Cir. 2009).  The inquiry

-23-

probes whether, in the interests of justice and all other
relevant concerns, the action would best be brought in another
venue.

    1.   <u>Deference to Plaintiffs' Choice of Forum</u>

Generally, there is a strong presumption in favor of the
plaintiff's choice of forum, particularly where the plaintiff
is an American citizen. <u>See</u> <u>Piper Aircraft</u>, 454 U.S. at 250;
<u>Dirienzo v. Phillip Servs. Corp.</u>, 294 F.3d 21, 28 (2d Cir.
2002); <u>Iragorri</u>, 274 F.3d at 70-71. However, where the
plaintiffs are all foreign residents, and the circumstances
indicate that the parties and material events bear no bona
fide connection to the United States, the choice of forum is
not entitled to special deference. <u>See</u> <u>Piper Aircraft</u>, 454
F.2d at 256. The degree of deference to be accorded a foreign
plaintiff's choice of forum moves on a sliding scale depending
on several relevant considerations. <u>See</u> <u>Iragorri</u>, 274 F.3d
at 71. Weighed in this analysis is the plaintiff's or the
lawsuit's bona fide connection to the United States and to the
forum of choice, as well as whether forum-shopping reasons may
have motivated the plaintiff's choice. <u>See</u> <u>Pollux Holding
Ltd. v. The Chase Manhattan Bank</u>, 329 F.3d 64, 71 (2d Cir.
2002) ("The greater the plaintiff's or the lawsuit's bona fide
connection to the U.S., the more difficult it will be for the

-24-

defendant to gain dismissal for forum non conveniens."); see also Iragorri, 274 F.3d at 71-72; Do Rosário Veiga v. World Meteorological Organisation, 486 F. Supp. 2d 297, 302 (S.D.N.Y. 2007).

Defendants argue that Plaintiffs' choice of forum is entitled to minimal or no deference because they are all residents of Norway and their choice was motivated by forum-shopping reasons. (See Defs.' Oct. 7 Letter at 3; Defs.' Oct. 21 Letter at 2.)  While it is true that foreign plaintiffs are not accorded the same degree of deference as American plaintiffs, where there are legitimate reasons for bringing suit in this jurisdiction, foreign plaintiffs' choice of forum may still be entitled to deference. See, e.g., Bigio v. Coca-Cola Co., 448 F.3d 176, 179 (2d Cir. 2006) ("The more that a plaintiff, even a foreign plaintiff, chooses to sue in a United States court for 'legitimate reasons,' the more deference must be given that choice." (quoting Iragorri, 274 F.3d at 73)); Pollux Holding, 329 F.3d at 71.  The Court will apply the Iragorri sliding-scale analysis to determine the degree of deference to be accorded Plaintiffs' choice.

Defendants assert that Plaintiffs' choice of forum was motivated by forum-shopping reasons.  (See Defs.' Oct. 7 Letter at 3-4.)  In support, Defendants cite a Norwegian news

-25-

article in which Skjørshammer, the executor of the Terra bankruptcy estate, states, "American law is very plaintiff friendly." (Declaration of Alastair Wood, dated October 21, 2009 ("Wood Decl."), Ex. 8.) Skjørshammer's statement, made at a press conference focusing on the costs that Terra's estate would incur through litigation, refers to the low likelihood, compared to other jurisdictions, that losing parties in United States civil litigation will be ordered to pay their opponents legal expenses. (See Wood Decl., Ex. 8; Reply Declaration of Skjørshammer, dated October 27, 2009, ¶ 2.)

Defendants also rely on a memorandum prepared in August 2008 (the "Narvik Assessment") by the administrative advisor of Narvik (the "Narvik Advisor"), one of the Municipalities. (See Wood Decl. 10, Ex. 10.) After considering the relative merits of suit in the United States, as opposed to England or Norway, the Narvik Advisor concludes that Narvik should not engage American law firms "at the present time" for the purpose of bringing suit against Citigroup in the United States, despite the opportunity to retain an American firm on a contingency fee basis. (Id.) The Narvik Advisor's recommendation was based on a finding by English attorneys that "any possible legal action against Citibank most probably

will have to take place according to English or Norwegian law
-- and not American law."   (Id.)

The availability of contingency fees and the low
likelihood of having to pay opposing counsel's legal fees both
represent comparative tactical advantages afforded by United
States civil litigation.  The evidence submitted by Defendants
thus indicates, at least as to Terra and the municipal
corporation of Narvik, that forum-shopping reasons may have
motivated the choice of this forum.  But for the Court to
accord Plaintiffs' choice of forum minimal or no deference  on
this basis would belie the sliding-scale principle of the
Iragorri analysis.  Among the reasons for the sliding-scale
analysis are the practical realities of cross-border disputes.
See In re Air Crash Near Peixoto De Azevada Bra., 574 F. Supp.
2d 272, 279 (E.D.N.Y. 2008).  In a dispute with connections to
multiple jurisdictions, plaintiffs will understandably choose
a forum based on numerous considerations, including any
potential advantage a particular forum affords.  Further,
although the Narvik Assessment evidences Narvik's
consideration of contingency fees in its decision to forego
retaining American counsel in August 2008, such consideration
does not necessarily implicate contingency fees as the reason

why Narvik, or any of the other Municipalities, ultimately
brought suit in this jurisdiction in August 2009.

Defendants correctly assert that a plaintiff's choice of
a defendant's home forum, over another forum where a defendant
is amenable to suit and to which the plaintiff and the case
are much more closely connected, often suggests forum-
shopping. But here, despite any connections between the
relevant transactions and other fora, this action also
possesses bona fide connections to New York, Plaintiffs'
chosen forum. See Pollux Holding, 329 F.3d at 74 ("[A]
plaintiff's choice to initiate suit in the defendant's home
forum -- as opposed to any other where the defendant is also
amenable to suit -- only merits heightened deference to the
extent that the plaintiff and the case possess bona fide
connections to, and convenience factors favor, that forum.").
Where a case, such as this one, bears a bona fide connection
to the defendant's home forum, evidence of tactical forum-
shopping does not necessarily result in minimal or no
deference. The sliding scale analysis distinguishes between
a plaintiff's legitimate right to select a forum and mere
forum-shopping that is designed to burden the defendants. See
Iragorri, 274 F.3d at 72.

Here, the Court finds that Plaintiffs have legitimate reasons for bringing suit in this jurisdiction. As described above in the Conduct Test analysis, the essential core of Defendants' allegedly fraudulent acts in furtherance of the alleged fraud were committed in New York. Neither the Narvik Advisor's assessment of the merits of potential claims under American law, nor Skjørshammer's statement to the press, undermines this jurisdictional fact.

While the Court is persuaded that forum-shopping reasons may have, to a certain extent, motivated Plaintiffs' choice of forum, the Court is also mindful of Plaintiffs' legitimate reasons for bringing suit in this jurisdiction. Accordingly, though not entitled to full deference, the Court nonetheless finds that Plaintiffs' choice of forum is entitled to some deference.

2. Availability of an Adequate Alternative Forum

The adequate alternative forum requirement of the forum non conveniens doctrine is ordinarily satisfied if (1) the other forum is available because the defendant is amenable to service of process there, and (2) the forum permits litigation of the "subject matter of the dispute and offers remedies for the wrongs the plaintiff alleges, even if the causes of action and relief available there are not identical in every respect

-29-

to the claims and relief the plaintiff seeks in his chosen forum." <u>Do Rosario Veiga</u>, 486 F. Supp. 2d at 303 (<u>citing Monegasque</u>, 311 F.3d at 499); <u>see also Capital Currency Exch. v. National Westminster Bank PLC</u>, 155 F.3d 603, 610 (2d Cir. 1998).

Defendants assert that both England and Norway are adequate alternative forums. Defendants submit that they would consent to service of process in either Norway or England. (<u>See</u> Defs.' Oct. 7 Letter at 4.) Further, Defendants assert that both England and Norway permit suit for the types of fraud-based claims asserted here, and have been found to be adequate forums for the adjudication of civil disputes.

Upon review of the submissions by both parties, the Court is persuaded that both Norway and England present alternative and adequate forums for the adjudication of this dispute. Federal circuit courts have found both Norway and England to be adequate forums for the adjudication of civil disputes, <u>see Pollux Holding</u>, 329 F.3d at 75 (England), <u>Alpine View Co. v. Atlas Copco AB</u>, 205 F.3d 208, 221 (5th Cir. 2000) (Norway), and Defendants represent that they would consent to service of process in both countries, which satisfies the alternative forum requirement. <u>See Turedi</u>, 460 F. Supp. 2d at 524.

-30-

Further, the Court is persuaded that both forums offer remedies for the wrongs Plaintiffs allege. (<u>See</u> Declaration of Finn Myhre, dated October 21, 2009, ¶¶ 7-13; Declaration of Stephen Moriarty QC in Support of Defendants' Motion to Dismiss, dated October 19, 2009 ("Moriarty Decl."), ¶¶ 5-21.) Plaintiffs argue that, just as in this forum, an English court could dismiss on forum non conveniens grounds. (<u>See</u> Plaintiffs' Reply Letter, dated October 14, 2009, at 4 (<u>citing</u> Declaration of Felicity Toube, dated October 13, 2009, ¶¶ 5, 7).) However, the Court is persuaded that the prospect contemplated by Plaintiffs could only occur if the Defendants were to dispute an English court's jurisdiction. (<u>See</u> Moriarty Decl. ¶ 13.) Because Defendants represent that they would consent to jurisdiction in England, Plaintiffs' argument is without merit.

Accordingly, the Court finds both Norway and England to be adequate and alternative forums.

### 3. Public and Private Interest Factors

Where a plaintiff's choice of forum is entitled to deference, the Supreme Court has recognized that dismissal may nevertheless be appropriate where certain private and public interest considerations weigh in favor of adjudication in an adequate alternative forum. <u>See</u> <u>Piper Aircraft</u>, 454 U.S. at

-31-

255; <u>Gilbert</u>, 330 U.S. at 508-09.  The burden of demonstrating
that a lawsuit would be more appropriately adjudicated in
another forum is on the defendant seeking dismissal.  <u>See</u> <u>Wiwa</u>
<u>v. Royal Dutch Petroleum</u>, 226 F.3d 88, 100 (2d Cir. 2000).

The private and public interest considerations enumerated
in <u>Gilbert</u> include: (1) ease of access to evidence; (2) the
availability of compulsory process for the attendance of
unwilling witnesses; (3) the cost of willing witnesses'
attendance; (4) practical problems involving the efficiency
and expense of a trial; (5) enforceability of judgments; (6)
administrative difficulties flowing from court congestion; (7)
imposing jury duty on citizens of the forum; (8) the local
interest in having controversies decided at home; and (9) the
avoidance of the unnecessary application of foreign law.  <u>See</u>
<u>Gilbert</u>, 330 U.S. at 508-09.

<u>Gilbert</u> instructs reviewing courts to disturb a
plaintiff's choice of forum only where the balance of private
and public interest considerations "strongly" favors the
moving defendant.  <u>Dirienzo</u>, 294 F.3d at 30-31 (<u>citing</u>
<u>Gilbert</u>, 330 U.S. at 508).  Here, the Court is not persuaded
that the <u>Gilbert</u> considerations weigh strongly in favor of
dismissal.  Defendants urge the Court to dismiss Plaintiffs'
suit because the vast majority of contacts between Plaintiffs

-32-

and Defendants occurred in Europe; all of Plaintiffs'
witnesses and documentary evidence are in England; Norway has
a significant local interest in the dispute; the courts of
Norway and England are comparatively less congested than this
Court; and New York's citizens should not be burdened with
jury service in this litigation. (See Defs..' Oct. 7 Letter
at 5; Defs..' Oct. 21 Letter at 3-4.)

After considering Defendants' arguments, as well as
countervailing facts weighing in favor of exercising
jurisdiction, the Court concludes that Defendants have not
shown that the Gilbert private interest considerations weigh
strongly in favor of dismissal. Even assuming that a majority
of the relevant evidence is in Europe, as Defendants contend,
Defendants have offered no reason why transporting any
evidence to New York would pose any significant hardship to
the parties. See Dirienzo, 294 F.3d at 30 ("To the extent
documents exist [overseas], advances in transportation and
communication accord this issue less weight."); Cyberscan
Tech. v. Sema Ltd., No. 06 Civ. 526, 2006 WL 3690651, at *10
(S.D.N.Y. Dec. 13, 2006). Further, although several witnesses
reside in Europe, Plaintiffs have identified numerous
significant New York-based witnesses most intimately involved
in and knowledgeable about the alleged fraudulent acts taken

-33-

in New York, (See Skjørshammer Decl. ¶ 22), and Defendants
have not identified any Europe-based witnesses as unwilling or
unable to appear in this Court.   See Cyberscan, 2006 WL
3690651 at *10 (quoting Haywin Textile Prods., Inc. v.
International Fin. Inv., 137 F. Supp. 2d 431, 436 (S.D.N.Y.
2001) ("Such identification is generally required for a forum
non conveniens dismissal.")).

       As to the public interest considerations, while this
litigation is indeed a dispute with great local interest in
Norway, and the Southern District of New York is undoubtedly
a heavily-congested court, these considerations are not
sufficient to warrant dismissal.   As courts in this Circuit
have consistently recognized, "Congress did not want to allow
the United States to be used as a base for manufacturing
fraudulent security devices for export, even when these are
peddled only to foreigners."   Psimenos, 722 F.2d at 1045;
Vencap, 519 F.2d at 1017; In re Alstom, 406 F. Supp. 2d at
383.   As detailed above, the core operative facts underlying
Plaintiffs' federal securities fraud claims arise from New
York-based conduct.   The Southern District of New York is
therefore the forum with the most significant contacts with,
and the greatest interest in, the adjudication of this

dispute.  See Corporacion v. Schumacher, 418 F. Supp. 2d 529, 536 (S.D.N.Y. 2006).

The Court concludes that the balance of the Gilbert private and public interest factors do not weigh strongly in favor of dismissal.  The Defendants have failed to show that "the chosen forum is ... genuinely inconvenient and the [alternative] forum[s] significantly preferable." Bigio, 448 F.3d at 179 (citation and quotation omitted).  Accordingly, Defendants' motion to dismiss for forum non conveniens is denied.

### IV. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion to dismiss (Docket No. 8) of defendants Citigroup, Inc., Citigroup Global Markets, Inc. and Citigroup Alternative Investments LLC is DENIED.

**SO ORDERED.**

Dated:    New York, New York
          16 February 2010


                                  VICTOR MARRERO
                                     U.S.D.J.