UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Municipality of BREMANGER;<br>The Municipality of HATTFJELLDAL;<br>The Municipality of HEMNES;<br>The Municipality of KVINESDAL;<br>The Municipality of NARVIK;<br>The Municipality of RANA; and<br>The Municipality of VIK,<br><br>          Plaintiffs,<br><br>    v.<br><br>CITIGROUP GLOBAL MARKETS, INC., and<br>CITIGROUP ALTERNATIVE INVESTMENTS LLC,<br><br>          Defendants. | 09 Civ 7058 (VM) (KMF)<br><br>ECF Case |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities ...................................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 4

I.     Citigroup Held Itself Out As A Leader In The U.S. Municipal Bond Market .................. 4

II.    Citigroup's Marketing Materials Contained Numerous Misrepresentations And
Omitted Critical Information ................................................................................. 5

      A.     The Wyatt Report Warned Citigroup That The TOB Fund's Hedging
Strategy Did Not Work ..................................................................... 5

      B.     Citigroup Knew That The TOB Fund Was Extremely Volatile .......................... 6

      C.     Citigroup Knew That No Arbitrage Strategy Actually Existed ........................... 7

      D.     Citigroup Knew That The Purported Correlation Between LIBOR
And U.S. Municipal Bond Rates Was Plummeting ................................. 8

      E.     Citigroup Failed To Inform Terra Or The Municipalities That Because
The Municipalities Were Investing In The Summer Of 2007, They Were
Almost Guaranteed To Lose Money ..................................................... 10

      F.     By 2007, Citigroup Had Stripped All Data Regarding The TOB Fund's
Unusual Risks From Its Marketing Materials ......................................... 11

III.    Citigroup's Marketing Of The TOB Fund To The Municipalities ................................. 12

IV.    Terra Acted As Dual Agent For The Plaintiffs And Citigroup ........................................ 13

V.    Citigroup Controlled, Reviewed And Authorized Terra's Marketing Materials .............. 15

VI.    Terra Conveyed Citigroup's Misrepresentations To The Plaintiffs ................................. 16

      A.     Bremanger, Kvinesdal And Vik ........................................................ 16

      B.     Hattfjelldal, Hemnes, Narvik And Rana ............................................... 17

VII.   Citigroup Affirmed The Sale Of The FLNs To The Plaintiffs ....................................... 18

ARGUMENT ............................................................................................................... 18

I.     Applicable Legal Standards ......................................................................... 18

i

II.    Defendants Have Failed To Demonstrate That The Municipalities' Fraud Claim
       Should Be Dismissed ............................................................................................... 19

       A.    The Municipalities Directly Relied On Citigroup's Misrepresentations In
             Deciding To Purchase The FLNs.............................................................. 19

       B.    Citigroup's Numerous Omissions Also Support The Municipalities'
             Fraudulent Concealment Claim ................................................................ 23

       C.    The Municipalities Also Relied On The Advice Of Terra................................... 26

             1.    Citigroup Is Estopped From Denying Terra's Agency ........................... 29

             2.    Citigroup Ratified Terra's Acts As Agent ................................. 31

III.   Citigroup's Misrepresentations And Omissions Directly And Proximately Caused
       Plaintiffs' Injuries ..................................................................................................... 32

IV.    Defendants Have Failed To Demonstrate That Plaintiffs' Negligent
       Misrepresentation Claims Should Be Dismissed ............................................................ 33

       CONCLUSION........................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbate v. Abbate,*
    82 A.D.2d 368, 441 N.Y.S.2d 506 (2d Dep't 1981) ................................................28

*Adebiyi v. Yankee Fiber Control, Inc.,*
    705 F. Supp. 2d 287 (S.D.N.Y. 2010) ...................................................................32

*Amusement Indus., Inc. v. Stern,*
    693 F. Supp. 2d 327 (S.D.N.Y. 2010) ..........................................................19, 23

*Amusement Indus. v. Citigroup Global Markets Realty Corp. (In re First Republic Group*
    *Realty, LLC),* 421 B.R. 659 (Bankr. S.D.N.Y. 2009). ....................................31, 32

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...........................................................................................19

*Anwar v. Fairfield Greenwich Ltd.,*
    728 F. Supp. 2d 372 (S.D.N.Y. 2010) ..........................................................33, 34

*Arnold Chevrolet LLC v. Tribune Co.,*
    418 F. Supp. 2d 172 (E.D.N.Y. 2006) ...............................................................19

*Bd. of Trade of City of Chi. v. Hammond Elevator Co.,*
    198 U.S. 424 (1905) ...........................................................................................29

*Brass v. Am. Film Techs., Inc.,*
    987 F.2d 142 (2d Cir. 1993) ...............................................................................24

*Caiola v. Citibank, N.A.,*
    295 F.3d 312 (2d Cir. 2002) ...............................................................................22

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002) ...............................................................................24

*Chem. Bank v. Affiliated FM Ins. Co.,*
    169 F.3d 121 (2d Cir. 1999) ........................................................................30, 31

*Creative Waste Mgmt. v. Capitol Envtl. Servs.,*
    429 F. Supp. 2d 582 (S.D.N.Y. 2006) ...............................................................34

*Credit Alliance Corp. v. Arthur Andersen & Co.,*
    65 N.Y.2d 536, 493 N.Y.S.2d 435 (1985) .....................................................33, 34

*DeMaria v. Andersen,*
    318 F.3d 170 (2d Cir. 2003) ...............................................................................23

*Derdiarian v. Felix Contractor Corp.*,
 51 N.Y.2d 308, 434 N.Y.S.2d 166 (1980) .............................................................33

*First Alabama Bank of Montgomery, N.A. v. First State Ins. Co.*,
 899 F.2d 1045 (11th Cir. 1990) ...................................................................27, 28

*First Nat'l Bank of Cent. Ala. v. Moore*,
 2010 Bankr. LEXIS 1529 (Bankr. N.D. Ala. May 6, 2010) ..................................27

*In re Beacon Assocs. Litig.*,
 745 F. Supp. 2d 386 (S.D.N.Y. 2010).................................................................26

*In re Managed Care Litig.*,
 185 F. Supp. 2d 1310 (S.D. Fla. 2002) ..............................................................28

*In re Manzanares*,
 345 B.R. 773 (Bankr. S.D. Fla. 2006).................................................................28

*In re Northern Telecom Ltd. Sec. Litig.*,
 42 F. Supp. 2d 234 (S.D.N.Y. 1998)...................................................................27

*In re Prudential Sec. Ltd. P'shps Litig.*,
 930 F. Supp. 68 (S.D.N.Y. 1996) .......................................................................22

*In re Shulman Transp. Enter., Inc.*,
 744 F.2d 293 (2d Cir. 1984)...............................................................................29

*Indian Brand Farms, Inc. v. Novartis Crop Prot. Inc.*,
 617 F.3d 207 (3d Cir. 2010)..........................................................................20, 21

*IRB-Brazil Resseguros, S.A. v. Inepar Invs., S.A.*,
 83 A.D.3d 573, 922 N.Y.S.2d 308 (1st Dep't 2011) ............................................32

*Mausarra ex rel. Beninati v. Yamaha Motor Co.*,
 178 Misc. 2d 941, 680 N.Y.S.2d 793 (Sup. Ct. 1998)...........................................32

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
 900 F.2d 576 (2d Cir. 1990)...............................................................................23

*Meade v. Cedarapids, Inc.*,
 164 F.3d 1218 (9th Cir. 1999) ............................................................................28

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
 500 F.3d 171 (2d Cir. 2007)...............................................................................25

*Merrill Lynch Capital Servs. v. UISA Fin.*,
 2012 U.S. Dist. LEXIS 51109 (S.D.N.Y. Apr. 10, 2012)......................................29

*Miller v. Premier Corp.*,
608 F.2d 973 (4th Cir. 1979) ................................................................31

*Nomura Sec. Int'l, Inc. v. E\*Trade Sec., Inc.*
280 F. Supp. 2d 184 (S.D.N.Y. 2003) .....................................................24

*O'Brien v. Citizens Ins. Co. of Am.*,
2007 N.Y. Misc. LEXIS 5685 (Sup. Ct. Aug. 6, 2007) ...........................24

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
98 F.3d 2 (2d Cir. 1996) ..........................................................................23

*Orix Credit All. v. Phillips-Mahnen, Inc.*,
1993 U.S. Dist. LEXIS 7071 (S.D.N.Y. May 26, 1993) ..........................31

*Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*,
73 N.Y.2d 417, 541 N.Y.S.2d 335 (1989) ...............................................34

*Ostano Commerzanstalt v. Telewide Sys., Inc*,
794 F.2d 763 (2d Cir. 1986) .....................................................................23

*Primavera Familienstiftung v. Askin*,
130 F. Supp. 2d 450 (S.D.N.Y. 2001) ......................................................22

*Robinson v. Sanctuary Record Groups, Ltd.*,
249 F.R.D. 144 (S.D.N.Y. 2008) .............................................................27

*Samuels v. Fradkoff*,
2005 N.Y. Misc. LEXIS 3610 (Sup. Ct. Aug. 10, 2005) .........................24

*Schwarz v. ThinkStrategy Capital Mgmt. LLC*,
2012 U.S. Dist. LEXIS 79453 (S.D.N.Y. May 31, 2012) ........................25

*Schwarz v. ThinkStrategy Capital Mgmt. LLC*,
797 F. Supp. 2d 439 (S.D.N.Y. 2011) ...........................................18, 19, 24

*Scientific Holding Co. v. Plessey, Inc.*,
510 F.2d 15 (2d Cir. 1974) .......................................................................30

*Sec. Investor Prot. Corp. v. BDO Seidman, L.L.P.*,
95 N.Y.2d 702, 723 N.Y.S.2d 750 (2001) ...............................................23

*Sec. Investor Prot. Corp. v. BDO Seidman, LLP*,
222 F.3d 63 (2d Cir. 2000) .......................................................................19

*Solutia Inc. v. FMC Corp.*,
456 F. Supp. 2d 429 (S.D.N.Y. 2006) .................................................8, 19

*Sport Motorcycle Center v. Colonia Ins. Co.*,
　227 A.D.2d 335, 643 N.Y.S.2d 59 (1st Dep't 1996) ...........................................28

*Sweeney v. Bruckner Plaza Assoc.*,
　57 A.D.3d 347, 869 N.Y.S.2d 453 (1st Dep't 2008) ...........................................33

*Sykes v. RFD Third Ave. 1 Assocs., LLC*,
　15 N.Y.3d 370, 912 N.Y.S.2d 172 (2010) ...........................................34

*Terra Sec. ASA Konkursbo v. Citigroup, Inc.*,
　740 F. Supp. 2d 441 (S.D.N.Y. 2010)...........................................22, 26, 33

*Trs. of the Am. Fed'n of Musicians & Employers' Pension Fund v. Steven Scott Enters.*,
　*Inc.*, 40 F. Supp. 2d 503 (S.D.N.Y. 1999) ...........................................30

*Turtur v. Rothschild Registry Int'l Inc.*,
　26 F.3d 304 (2d Cir. 1994)...........................................19

*Westpac Banking Corp. v. Deschamps*,
　66 N.Y.2d 16, 494 N.Y.S.2d 848 (1985) ...........................................34

*Woodling v. Garrett Corp.*,
　813 F.2d 543 (2d Cir. 1987)...........................................32

## OTHER AUTHORITIES

3 AM. JUR. 2D AGENCY (2011) ...........................................27

Fed. R. Civ. P. 56 ...........................................1, 18

Local Rule 56.1 ...........................................1

RESTATEMENT (SECOND) OF AGENCY (1958). ...........................................28

RESTATEMENT (SECOND) OF TORTS (1977)...........................................19

Plaintiffs, the Norwegian municipalities of Bremanger ("Bremanger"), Hattfjelldal ("Hattfjelldal"), Hemnes ("Hemnes"), Kvinesdal ("Kvinesdal"), Narvik ("Narvik"), Rana ("Rana"), and Vik ("Vik," and with Bremanger, Hattfjelldal, Hemnes, Kvinesdal, Narvik and Rana, the "Municipalities" or "Plaintiffs"), submit this memorandum of law in opposition to the motion of defendants Citigroup Global Markets, Inc. ("CGMI"), and Citigroup Alternative Investments LLC ("CAI," and with CGMI, "Citigroup") for summary judgment pursuant to Fed. R. Civ. P. 56(a).[1]

## PRELIMINARY STATEMENT

Discovery in this action has demonstrated that Citigroup marketed and sold to the Municipalities notes ("FLNs") linked to the TOB Capital Municipal Portfolio ("TOB Fund"), even though Citigroup knew that the FLNs were unusually risky products that were inappropriate for the investment objectives of public entities like the Municipalities. Indeed, in marketing the FLNs in 2007, Citigroup misrepresented to the Municipalities that the FLNs, among other things: (a) were an investment in an arbitrage strategy based on a mispricing in U.S. municipal bonds, and (b) had a risk profile similar to an investment in U.S. municipal bonds. Further, Citigroup concealed material information from the Municipalities, including the fact that:

(a)        Citigroup had retained a professor at the Massachusetts Institute of
           Technology ("MIT") to examine the hedging strategy used by the TOB Fund,
           and that the professor concluded that the hedging strategy did not work;

---

[1]  Submitted in support herewith is the Declaration of Michael M. Fay, dated July 16, 2012 ("Fay Dec.") and the Plaintiffs' Response to Defendants' Local Rule 56.1 Statement of Undisputed Facts ("RES"). Defendants' Memorandum of Law In Support Of Their Motion For Summary Judgment is referred to herein as "Citi Br."

   Also submitted herewith are declarations and an affidavit from current and former municipal officials and former employees of Terra Securities ASA. Although these witnesses were uncomfortable testifying at their depositions in English, they understand written English sufficiently to have submitted their declarations/affidavit in English.

(b)        Although the MIT professor recommended that Citigroup consider alternative hedging strategies, Citigroup did nothing;

(c)        Citigroup recognized internally that its purported "hedging strategy," which used swaps linked to the London Interbank Offered Rate ("LIBOR"), posed a "significant" risk of volatility;

(d)        Citigroup's own proprietary trading based on the investment strategy used by the TOB Fund – what Citigroup called a "municipal bond arbitrage strategy" – had demonstrated significant historic volatility and losses;

(e)        No real arbitrage opportunity existed, and the alleged mispricing in U.S. municipal bonds was instead a reflection of very real risk;

(f)        Investors in the TOB Fund had to "endure" volatility before they could realize any positive returns;

(g)        The summer of 2007 – when the Municipalities invested in the FLNs – was one of the worst times for entering a municipal bond arbitrage strategy and made it highly likely that the Municipalities would experience losses on their FLN investments;

(h)        The strong correlation that Citigroup touted between municipal bond and LIBOR rates (the alleged basis for its "hedging strategy") never existed and was deteriorating rapidly in 2006 and 2007; and

(i)        An investment in the TOB Fund was vastly riskier than a direct investment in municipal bonds.

Based upon Citigroup's misrepresentations, and without knowledge of Citigroup's significant omissions, the Municipalities purchased the FLNs through Citigroup and its

Norwegian agent, Terra Securities ASA ("Terra").  Within months, the TOB Fund's ineffective "hedging strategy" and intrinsic volatility – both of which were well known to Citigroup but concealed from Terra and the Municipalities – had caused the Municipalities significant investment losses.

Citigroup has now moved to dismiss Plaintiffs' claims for fraudulent and negligent misrepresentation, contending that the Municipalities cannot demonstrate reliance, proximate cause or a special relationship between Citigroup and Plaintiffs.  With over 550 purported statements of undisputed fact and 270 submitted exhibits, Citigroup argues that this case can somehow be reduced to judgment prior to trial.  Citigroup is wrong.

First, Citigroup's reliance contentions are of no merit because the record contains substantial evidence supporting three independent grounds for the Municipalities' claims:  (a) the Municipalities relied on Citigroup's misrepresentations; (b) Citigroup concealed significant information from both Terra and the Municipalities, which information, had it been revealed, would have dissuaded the Municipalities from purchasing the FLNs; and (c) the Municipalities relied on Terra, as their broker, which – with respect to the Municipalities – was also acting as Citigroup's agent.

Second, Citigroup's proximate cause contentions fail because they are based on Citigroup's conclusory assertion that it did not know how or to whom Terra was marketing the FLNs.  However, the record before this Court contains significant evidence to the contrary, including the testimony of two Terra brokers, which clearly creates a disputed issue of material fact.

Lastly, Citigroup's argument that no special relationship existed between Citigroup and the Municipalities is also premised on what is clearly a disputed issue of material fact:

Citigroup's knowledge that the Municipalities were the ultimate purchasers of the FLNs. Further, undisputed facts demonstrate that Citigroup had specialized and vastly superior knowledge concerning the FLNs, which facts further underscore that Citigroup's effort to dismiss the Municipalities' negligent misrepresentation claim is of no merit.

For these reasons, and as more fully demonstrated below, Citigroup's motion for summary judgment should be denied in its entirety.

## STATEMENT OF FACTS

I.   **Citigroup Held Itself Out As A Leader**
     **In The U.S. Municipal Bond Market**

In 2006, Citigroup formed Citigroup Municipal Investors ("CMI") as a joint venture ("Joint Venture"), to enable CAI and CGMI to work jointly in structuring, marketing and managing TOB Fund investments.  The Joint Venture was supposed to be a synergistic effort, combining the skills and expertise of the employees at CAI and CGMI.  In May 2006, CMI first launched the TOB Fund based on a United States municipal bond arbitrage strategy that Citigroup had supposedly employed for over 20 years in its own proprietary funds.  By 2007, Citigroup was marketing itself to Terra and the Municipalities as an expert in the United States municipal bond market and touted that it had managed "the largest municipal position of any U.S. bank in each of the past 11 years."  [SOF at ¶¶ 564-72]

In May 2007, Citigroup sold FLNs issued by Banque AIG and linked to the TOB Fund to the Municipalities of Bremanger, Kvinesdal and Vik (the "Banque AIG FLNs"), and in June 2007, Citigroup sold FLNs issued by Starling PLC and linked to the TOB Fund to the Municipalities of Hemnes, Rana, Hattjfedall and Narvik (the "Starling FLNs").  [SOF at ¶¶ 573-74]

4

II.     **Citigroup's Marketing Materials Contained Numerous
        Misrepresentations And Omitted Critical Information**

        A.      **The Wyatt Report Warned Citigroup That
                The TOB Fund's Hedging  Strategy Did Not Work**

Unbeknownst to Terra and the Plaintiffs, Citigroup knew as early as 2005 that investment strategies like the TOB Fund were flawed and incredibly risky.  In 2005, Citigroup had experienced a loss of approximately $250 million in its proprietary municipal bond arbitrage position, a loss so big that a senior executive at CGMI, Joseph Geraci ("Geraci"), complained that he might lose his new job managing Citigroup's proprietary portfolio.  [SOF at ¶ 575]

In response, Geraci hired Professor John Wyatt ("Prof. Wyatt"), an MIT professor, to study, among other things, Citigroup's LIBOR swap-based hedging strategy.  In an internal report ("Wyatt Report") issued initially on April 21, 2005, Prof. Wyatt and his MIT co-authors (who included Geraci's own brother) criticized the effectiveness of LIBOR swaps as a hedge for a municipal bond position and recommended that Citigroup investigate the use of alternative hedge strategies, such as "BMA swaps" (swaps linked to the Bond Market Association's index of weekly floating municipal rates).  Among other things, the Wyatt Report specifically informed Citigroup that unless a LIBOR swap rate was perfectly correlated with a municipal bond rate, that swap, when used as a hedge, could not eliminate all of the bond's volatility.  For example, the Wyatt Report showed that even if the correlation between LIBOR and municipal bond rates had a coefficient of 0.96 (1 being perfect), a LIBOR swap could at best reduce the volatility of the municipal bond position by only 72 percent.  Even more disturbing, the Wyatt Report demonstrated that the ability of LIBOR swaps to reduce volatility was highly non-linear:  *i.e.,* as the correlation dropped from .96, the amount of volatility reduction decreased dramatically.  For example, even at a .90 correlation, the LIBOR swap could only reduce volatility by 56 percent. [SOF at ¶¶ 576-82]

Geraci testified that Prof. Wyatt's work was "very thorough" and "confirmatory" of what Citigroup already knew about the relationship between municipal and LIBOR rates, and that he did not find "the data particularly surprising."  In addition, Citigroup told Prof. Wyatt that "[w]e obviously have a large stake in the work you are doing as the results will help us fundamentally change the way we do business" and continued to retain Prof. Wyatt through 2008.  However, Citigroup did not investigate other hedging strategies, did nothing to change the way the TOB Fund was hedged, never revealed Prof. Wyatt's conclusion in its TOB Fund marketing materials and never told Terra or the Municipalities about Prof. Wyatt's recommendations.  In fact, Craig Henick ("Henick"), the manager of the TOB Fund, received, but did not even bother to read the Wyatt Report.  [SOF at ¶¶ 583-93]

Professor Wyatt testified at his deposition that if Citigroup had used BMA swaps instead of LIBOR swaps as a hedging strategy, Citigroup would have saved several hundred million dollars or more.  [SOF at ¶ 603]

## B.     Citigroup Knew That The TOB Fund Was Extremely Volatile

Prof. Wyatt's results were indeed "confirmatory" of what Citigroup already knew about volatility (sometimes referred to as "mark-to-market" volatility) in municipal bond arbitrage strategies.  For example, in an email from April 2005, Geraci responded to various Citigroup employees by agreeing to the following statements regarding municipal bond arbitrage strategies:

> The interest rates in the LIBOR market and . . . those in the Muni market move somewhat independently . . . .  This had the effect of *creating significant M-T-M [mark-to-market] movements in the portfolio.*
>
> . . .
>
> From a risk management perspective, the Citi TOB portfolio has *significant short-term volatility and generates significant downside market risk.*

[SOF at ¶¶ 604-06; emphasis added]  Citigroup marketing materials from 2005 actually included a number of different slides discussing this mark-to-market risk and graphically depicting the historic volatility that Citigroup had experienced in municipal bond positions; however, by 2007, when the Municipalities purchased the FLNs, those slides had been eliminated from the TOB Fund marketing materials.  [SOF at ¶ 607]

As another example, in marketing materials created by Citigroup in December 2005, Citigroup specifically recognized that TOB Fund investors would have to "endure the mark-to-market volatility" before realizing positive returns; by 2007, this statement had also been deleted from the TOB Fund marketing materials.  In different materials dated November 2005, Citigroup conceded that LIBOR swaps, as a hedging tool, created "significant" "basis risk," *i.e.*, the volatility caused by ineffective hedging.  In fact, in 2005 and 2007, Citigroup drafted marketing materials where it discussed how municipal bond arbitrage investors could choose among differing hedging strategies – LIBOR swaps ("significant" basis risk), BMA swaps ("moderate to significant" basis risk) and MMD rate locks ("low" basis risk) – based on their investment profile.  However, these materials were never shown, and such choices were never offered, to Terra or the Plaintiffs.  [SOF at ¶¶ 612-614, 599]

### C.    Citigroup Knew That No Arbitrage Strategy Actually Existed

Citigroup was also internally aware that the TOB Fund did not offer any actual "arbitrage"[2] strategy.  In internal documentation dated June 4, 2003, Citigroup conceded that the spread between LIBOR and municipal rates was due to the risks associated with tax-exempt bonds – such as call option risk, liquidity risk and default risk – rather than a structural market inefficiency.  Further, in marketing materials dated September 2005, Citigroup actually touted

---

[2]  As even Citigroup acknowledges, the term "arbitrage" is commonly-understood to signify a risk-free or low risk concept to take advantage of a market inefficiency or mispricing.  The TOB Fund investments sold to the Plaintiffs did not fit within that commonly-understood definition.  [SOF at ¶ 618]

the "Lack of Arbitrage" in the TOB Fund because this absence of arbitrage "Presents Trading Opportunities." Citigroup's early TOB Fund marketing materials never mentioned any arbitrage opportunity, and marketing materials created in 2008 – after the Municipalities had invested and incurred significant losses – dropped any reference to an arbitrage opportunity. Moreover, in June 2006, at the TOB Fund's inception and following months of work with the "arbitrage" strategy, David Thornton ("Thornton"), a Citigroup analyst who prepared the TOB Fund marketing materials, wrote in an email that he was "still not sold that what we do is a true arbitrage…." Lastly, in 2010, Jim O'Brien, co-head of CAI, testified that a municipal arbitrage strategy nearly identical to the TOB Fund was not, in his consideration, an "arbitrage." [SOF at ¶¶ 618-26]

### D. Citigroup Knew That The Purported Correlation Between LIBOR And U.S. Municipal Bond Rates Was Plummeting

In order to sell the TOB Fund to unwitting investors, Citigroup represented that the correlation between LIBOR and municipal bond rates was exceedingly high (over .96 where 1 is perfect) and that LIBOR swaps, although based on a rate different from municipal bonds, were thus a near perfect hedge. Of course, Citigroup never informed its investors that Prof. Wyatt had discovered that even at such high correlations, LIBOR swaps were ineffective as a hedge. Citigroup also failed to inform its investors that, against the advice of Prof. Wyatt, Citigroup had calculated the LIBOR/municipal rate correlation in a manner that made it look artificially high.[3] But most disturbingly, Citigroup failed to inform Terra or the Municipalities that even its own miscalculated correlation was plummeting in 2006 and 2007. [SOF at ¶¶ 641-43]

---

[3] Wyatt informed Citigroup that the regression analysis of the changes in municipal bond and LIBOR swap *rates* was vital in determining whether an optimal LIBOR swap hedge could minimize the volatility of a municipal bond position. Citigroup, however, provided Terra with correlation data that improperly used a *levels-of-change* analysis, generating a higher correlation, when it should have used a rates-of-change analysis, which would have shown a decidedly lower correlation. [SOF at ¶ 642]

The correlation analysis contained in Citigroup's TOB Fund marketing materials was updated throughout 2005, when each update showed increasing correlation. However, after September 2005, the correlation was never again updated and the reason why is clear: the correlation was declining dramatically. Internally, Citigroup was regularly calculating a five year correlation (known as a $R^2$ factor) for LIBOR and municipal bond rates, which revealed this steady decline:

VIII. Failure to Update Regression Analysis



[SOF ¶¶ 644-46] As shown above, in May 2007, just before the Banque AIG FLNs were purchased, Citigroup's five year $R^2$ factor for LIBOR and municipal bond rates was only .22, not the .96. represented by Citigroup. And, in June 2007, just before the Starling FLNs were purchased, Citigroup's five year $R^2$ factor *was only .18.* Clearly, Citigroup's LIBOR-based hedging strategy was doomed to fail, and yet neither Terra nor the Municipalities were ever told anything. [SOF at ¶¶ 647-49]

**E.    Citigroup Failed To Inform Terra Or The Municipalities That
Because The Municipalities Were Investing In The Summer
Of 2007, They Were Almost Guaranteed To Lose Money**

Another fact concealed by Citigroup was the importance of timing in making an

investment in the TOB Fund.  In a November 10, 2005 marketing presentation – not provided to

Terra or the Municipalities – Citigroup informed investors that "[t]he total return on a TOB

position hedged in LIBOR depends on the initial levels of long term MMD and LIBOR rates,

due to the mark-to-market associated (sic) with the position.  Therefore, *the return is greatly*

*dependent on the time at which the position was established*."  [SOF at ¶ 627, emphasis added]

Citigroup then advised that an investor should invest at a time of "muni cheapening" (when long

term municipal bonds were cheap relative to LIBOR rates) and not at the time of "muni richness"

(when long term municipal bonds were expensive relative to LIBOR rates).  As Thornton has

testified, if all else is held constant, parties who invest at a time of "muni richness" would be

"expect[ed] to lose money."  [SOF at ¶ 629]

However, in later versions of the TOB Fund marketing materials, including those

provided to Terra and the Municipalities, Citigroup sought to mislead potential investors with

regard to the significance of timing of entry risks.  In an August 29, 2006 email to Geraci, among

others, regarding edits to the TOB Fund marketing materials, Thornton wrote:  "slide 13:  the

appearance of the residuals graphs has been changed in an attempt to refocus potential investors

on the value of skilled leverage management, and take attention away from glaring muni

richness."  By the time Terra received these materials, the slide had been further altered and

additional information had been removed.  [SOF at ¶¶ 628-29]

Ultimately, the Municipalities invested at a time of significant "muni richness" and, as a

result, were almost guaranteed to lose money.  Citigroup's response was to see an opportunity to

attract more investors.  Indeed, in an August 8, 2007 email exchange, *after* the market cheapened

and the Municipalities investments were nearly wiped out, the two managers of the TOB Fund, Henick and Edward Sun ("Sun"), cynically reflected on the failure of the Municipalities' investments:  Sun wrote, "some good news for a change.  [S]ept 1st would be a GREAT time for anyone to buy in," to which Henick responded, "Yeah.  It would be nice.  Considering terra may get triggered."  [SOF at ¶¶ 635-37]

Citigroup witnesses have admitted that many of these omissions involved important information an investor would have wanted to know in investing in the TOB Fund.  [SOF at ¶ 663]  Terra and the Municipalities have also testified that had they known about these omissions prior to entering into the FLN transactions, they would not have done so.  [SOF at ¶ 669]

**F.      By 2007, Citigroup Had Stripped All Data Regarding The TOB Fund's Unusual Risks From Its Marketing Materials**

As noted, early marketing presentations for the TOB Fund contained discussions of historic price fluctuations, the significant risk of using LIBOR swaps as a hedge, the possibility of alternative hedging strategies, mark-to-market risk, the need for investors to "endure" volatility before realizing any positive return, and the importance of timing of entry into a TOB Fund-like investment.  By 2007, *all of this data had been stripped out of the TOB Fund marketing materials by Citigroup.*  [SOF at ¶ 661]  Indeed, in 2007, Citigroup's marketing materials made the TOB Fund look like a safe investment in U.S. municipal bonds (which, according to Citigroup, almost never defaulted).  [SOF at ¶ 662]  However, in reality, the TOB Fund was an incredibly risky bet on the trajectory of two unrelated and poorly correlated interest rates, a fact that was concealed from Terra and the Municipalities, *even though all of the FLNs designed by Citigroup contained early termination triggers linked to the very risks that Citigroup was concealing.*  [SOF at (7B)]

11

III.   **Citigroup's Marketing Of The TOB Fund To The Municipalities**

In marketing the FLNs to the Municipalities, Citigroup provided Terra with various iterations of a PowerPoint presentation ("Presentation"), which made numerous misrepresentations, and left out critical information, about the TOB Fund.  [SOF at ¶ 664]

According to the Presentation, the TOB Fund was "seeking to capture arbitrage opportunities" by purchasing municipal debt and hedging using LIBOR swaps.  Pages 9, 10 and 11 of the Presentation falsely claimed, among other things:  (a) there was a persistent arbitrage opportunity due to an "inefficiency" in the municipal market; (b) the spread between the "Hypothetical Muni Curve" and the "Actual Muni Curve" created an arbitrage opportunity; and (c) the purported "yield curve arbitrage" exhibited "consistency."  [SOF at ¶ 665]  As shown above (*supra*, pp. 7-8), Citigroup knew that no such arbitrage opportunity existed.

The Presentation further misrepresented that LIBOR swaps would effectively hedge a leveraged municipal bond portfolio given the purported near perfect correlation between municipal bond and LIBOR rates.  Page 12 of the Presentation falsely claimed "the correlation between municipal rates and LIBOR has been strong over time."  On the same page, the graph entitled "Correlation Between Municipal and LIBOR Rates" ("Correlation Graph") falsely portrayed that in 2007, the correlation between municipal bonds and LIBOR was strong with an $R^2$ value of .9689 (1 being perfect).  Of course, as shown above, Citigroup knew that this correlation data was obsolete and misleading and that its hedging strategy was highly ineffective.  (*See supra*, pp. 8-9)  *See also* [SOF at ¶ 666][4]

---

[4]  Additionally, Citigroup marketed the TOB Fund as a means of mitigating risk in the Plaintiffs' portfolio through diversification.  This representation was untrue given that the Starling Plaintiffs' risks were magnified by Citigroup repackaging two highly correlated, undiversified and illiquid assets together (*i.e.* the Libretto CDOs and Starling FLNs).  [SOF at ¶¶ 667-668]

**IV.**   **Terra Acted As Dual Agent For The Plaintiffs And Citigroup**

Terra was a full service Norwegian brokerage firm formed by Terra Gruppen AS, a conglomerate owned by several local Norwegian savings banks.  The local banks had a long standing relationship with Norwegian municipalities, including Plaintiffs.  Terra provided the financial services the local banks could not provide directly.  [SOF at ¶¶ 670-71]

Two of Terra's brokers, Knut Opstad ("Opstad") and Harald Norberg ("Norberg"), had developed relationships with the Municipalities, providing them with brokerage and financial advisory services beginning in 2001.  Terra had also brokered several investments for the Plaintiffs, including some structured and arranged by Citigroup.  [SOF at ¶¶ 672-73]

Terra also developed a relationship with Citigroup.  Beginning in 2005, Norberg and Opstad of Terra had in-person meetings with Citigroup to discuss various Citigroup investment products.  Terra's primary contacts at Citigroup were Peter Arnold ("Arnold") and Hans Jacob Hafsteen ("Hafsteen").  Norberg and Opstad had multiple conversations with Arnold and Hafsteen during which they asked questions about what Citigroup products would be good investments for Plaintiffs and other municipalities in Norway.  [SOF at ¶¶ 674-76]

In December 2006, Citigroup representatives began discussing with Terra various investments linked to the U.S. municipal bond market, and materials regarding these investments were sent to Terra at either Opstad or Norberg's attention.  In 2007, Citigroup and the Terra brokers met to discuss a potential investment in the TOB Fund by the Municipalities. Subsequently, in May and June 2007, Citigroup retained and paid a commission to Terra to exclusively market and sell the FLNs in Norway to the Municipalities, among others, and entered into the May 18, 2007 ("May Agreement") and June 22, 2007 distribution agreements ("June Agreement" and with May Agreement, "Distribution Agreements") with Terra.  With these

transactions, Citigroup capitalized on Terra's pre-existing relationship with the Plaintiffs.  [SOF at ¶¶ (3B), 678-79]

The terms of the May Agreement stated that the FLNs were to be distributed to *private investors*, which under the English Financial Service Authority ("FSA") were to be afforded the greatest protection as less sophisticated investors.  [SOF at ¶ 680][5]  Thereafter Citigroup altered the June Agreement to change "private investors" to "sophisticated institutional investor," a change that occurred well after the Starling FLNs had been structured and just five days before the closing.  [SOF at ¶ 679-80]

In any event, Citigroup knew that the Municipalities were purchasing the FLNs.  Both Norberg and Opstad have testified that Citigroup was aware of the Plaintiffs' identities and the fact that the Municipalities were the ultimate purchasers of the FLNs.  [SOF at ¶ 682]  Norberg and Opstad also had discussions with Citigroup about whether the FLNs were suitable for the Municipalities.  Neither Hafsteen nor Arnold ever told Terra that the FLNs were inappropriate investments for the Municipalities or that Terra could not sell the FLNs to the Plaintiffs. In fact, Citigroup "felt an investment in the TOB Fund was appropriate for the Municipalities in that it was purportedly a safe, effectively hedged investment strategy."[6]  [SOF at ¶¶ 220, 682-84]

Relying upon Citigroup's representations, Terra agreed to act on Citigroup's behalf and distribute the FLNs, and as the Plaintiffs' broker, recommended the FLNs to the Municipalities. As described by Opstad:  "the [Plaintiffs] relied upon our advice," "the same way as we relied on Citi[group] when they give us advice."  [SOF at ¶ 685]

---

[5]  *See* English FSA, Conduct of Business Sourcebook (COBS), ch. 3 (2010), available at http://fsahandbook.info/FSA/html/handbook/COBS/3/7 (providing clients with a higher level of protection).

[6]  Additional record evidence further demonstrates Citigroup's knowledge of the Municipalities as the ultimate purchasers of the FLNs.  [*See* SOF at ¶ 685 ]

V.    **Citigroup Controlled, Reviewed And**
      **Authorized Terra's Marketing Materials**

Pursuant to the Distribution Agreements, Citigroup dictated the materials that Terra could use when marketing the FLNs and required that the representations Terra conveyed to the Plaintiffs be consistent with Citigroup's marketing materials.  [SOF at ¶ 686]  Complying with Citigroup's mandate, Terra conveyed to each of the Municipalities – prior to their purchase of the FLNs – the substance of Citigroup's representations about the TOB Fund and the FLNs.  [SOF at ¶ 687]

Opstad also translated portions of the Presentation into the Norwegian language ("Norwegian Presentation") while marketing the FLNs to certain Municipalities.  Before sending the Norwegian Presentation to the Municipalities, Opstad informed Citigroup that he translated the Presentation into Norwegian for distribution to the Plaintiffs.  [SOF at ¶ 688]  On May 9, 2007, Citigroup requested a copy of the Norwegian Presentation.  In compliance with Citigroup's request, on May 14, 2007, Opstad sent Hafsteen the Norwegian Presentation.  That same day, Hafsteen forwarded the Norwegian Presentation to CAI agents, Gary Muller, of Citigroup Global Markets Limited ("CGML") compliance, and CGMI's Vivek Kagzi ("Kagzi"), copying Arnold.  Hafsteen indicated a meeting would be held that day where they would "bring copies [of the Norwegian Presentation] to the meeting."  Kagzi forwarded the Norwegian Presentation to CAI and the MSD London distribution list, advising the recipients that a meeting had been set up with compliance in London to go over the Norwegian Presentation.  A meeting took place in London that same day and Hafsteen admitted to reviewing the Norwegian Presentation.  [SOF at ¶¶ 689-92]

Terra was never informed by Citigroup that the Norwegian Presentation did not accurately convey information about the TOB Fund.  Nor did Citigroup object in any way to

Terra distributing the Norwegian Presentation to the Plaintiffs.  Indeed, Citigroup informed Terra that it "felt that [the Norwegian Presentation] represented the main focus of [the Presentation]." [SOF at ¶¶ 25, 692-93]

## VI.    Terra Conveyed Citigroup's Misrepresentations To The Plaintiffs

### A.    Bremanger, Kvinesdal And Vik

In marketing the Banque AIG FLNs to Bremanger, Vik and Kvinesdal (collectively, "Banque AIG Plaintiffs"), Terra relied upon the Presentation and multiple communications with Citigroup to convey the substance of Citigroup's representations to these Plaintiffs including, among other things, that:  (a)  the TOB Fund would implement a strategy based upon a mispricing in the U.S. municipal bond market; (b) the strategy would be implemented through the purchase of long term municipal bonds, financed with short term bonds; (c) the TOB Fund derived profits by taking advantage of a mispricing in the market for long term U.S. municipal bonds; (d) Citigroup had extensive experience with TOB programs based on managing its own proprietary TOB portfolios and was investing its own funds in the TOB Fund;[7] (e) U.S. municipal bonds were very safe and rarely defaulted; (f) the FLNs had a risk profile similar to that on an investment in U.S. municipal bonds; and (g) the FLNs were a low risk investment. [SOF at ¶ 694]

Terra's statements about the FLNs being comparable to an investment in U.S. municipal bonds were consistent with representations by Arnold and Hafsteen and with the Presentation's discussion about the U.S. municipal bond market and the creditworthiness of AA and AAA U.S. municipal bonds.  Terra's statements about mispricing were consistent with the Presentation's claim that an arbitrage opportunity existed because of a mispricing in the long term municipal

---

[7]  Knut Veggeland ("Veggeland") from Kvinesdal knew the FLNs were arranged by Citigroup, while Haavardstun of Bremanger knew they were being arranged by an American third party.  [SOF at ¶ 694]

bond market.  Further, Terra's statements about the safety and effectiveness of the strategy were based upon numerous statements in the Presentation, and discussions with Arnold and Hafsteen. For example, the Presentation discusses, among other things:  (a) the purported strong correlation between municipal and LIBOR rates; (b) Citigroup's positive and strong history of investing in the strategy; (c) Citigroup's personnel who were supposedly highly experienced in the municipal market; (d) AA municipal bonds had not defaulted for 19 years; and (e) Citigroup's intent to invest $250 million in the TOB Fund.  [SOF at ¶¶ 695-98]

### B.    Hattfjelldal, Hemnes, Narvik And Rana

In marketing the FLNs to Hattfjelldal, Hemnes, Narvik and Rana (collectively, "Starling Plaintiffs"), Terra relayed the same information it gave to the Banque AIG Plaintiffs. The Starling Plaintiffs all also recalled that Terra told them that it had an exclusive partnership with Citigroup to sell the FLNs.  In addition, the Starling Plaintiffs received Norwegian presentations reaffirming these representations and further discussing the purported arbitrage opportunity, *i.e.*, the non-existent mispricing in U.S. municipal bond markets.[8]  [SOF at ¶¶ 699-700]

The Starling FLNs transaction involved the Starling Plaintiffs selling two Libretto CDOs back to Citigroup for repackaging as collateral for the purchase of the Starling FLNs.  [SOF at ¶ 701]  Because of the unique manner in which Citigroup structured the Starling FLNs, the Starling Plaintiffs were exposed to additional significant risks, including the combined risk of market fluctuations in the Libretto CDOs and the TOB Fund.  [SOF at ¶ 702]

---

[8]  In addition, Pedersen of Rana specifically recalled learning that the TOB Fund would implement a hedging strategy focused on the correlation between municipal and taxable interest rates and that the correlation was supposedly nearly perfect.  [SOF at ¶ 700]  Harald Maarnes ("Maarnes") of Plaintiff Hemnes also recalled that the FLNs supposedly had a low correlation to other asset classes.  [SOF at ¶ 700]

## VII.   Citigroup Affirmed The Sale Of The FLNs To The Plaintiffs

After the Banque AIG FLNs and Starling FLNs transactions closed, Citigroup did not cancel the Municipalities $117 million investment in the FLNs (which made them the largest outside investor in the TOB Fund) or return the over $1.7 million in management fees that Citigroup had collected, despite knowing the Municipalities' identities.  Further, Citigroup continued to manage Plaintiffs' investments, executed additional collateral agreements with the Starling Plaintiffs through Terra on August 22, 2007, and accepted from the Starling Plaintiffs additional collateral payments of NOK 84 million.  [SOF at ¶¶ 703-04]

As a result of Citigroup's misrepresentations and omissions, the Municipalities sustained significant losses from their FLN positions – losing between 67 to 88 percent of their original investments.  Nonetheless, the losses the Municipalities sustained between August 2007 and June 2008, were not unprecedented given the enormous risks of the TOB Fund – which Citigroup knew well, but failed to disclose to the Plaintiffs.  [SOF at ¶¶ 705-06]

## ARGUMENT

## I.   Applicable Legal Standards

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 440-41 (S.D.N.Y. 2006) (Pauley, J.); *see also* Fed. R. Civ. P. 56(c).  Citigroup, as the moving party, bears the burden of demonstrating the absence of any dispute as to a material fact.  *See Solutia*, 456 F. Supp. 2d at 440.  "In considering a motion for summary judgment, the Court's role is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried . . . ."  *Schwarz v. ThinkStrategy Capital Mgmt. LLC*, 797 F. Supp. 2d 439, 443-44 (S.D.N.Y. 2011) (quotations

omitted) (Kaplan, J.).  "In determining whether there is a genuine issue as to any material fact,

'[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

in [its] favor.'"  *Solutia*, 456 F. Supp. 2d at 440-41 (quoting *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986)).  "Summary judgment should be granted only

where no reasonable trier of fact could find in favor of the nonmoving party."  *Schwarz*, 797 F.

Supp. 2d at 444.  Citigroup fails to meet its burden here.

II.    **Defendants Have Failed To Demonstrate That**
       **The Municipalities' Fraud Claim Should Be Dismissed**

       A.    **The Municipalities Directly Relied On Citigroup's**
             **Misrepresentations In Deciding To Purchase The FLNs**

       Initially, Citigroup incorrectly argues that the Municipalities had to receive a hard copy

of the Presentation prior to purchasing the FLNs to sustain a fraud claim.  (Citi Br. at 22-27)

Instead, "[a] claim for fraud may lie even when a plaintiff does not directly rely on a fraudulent

representation made by the defendant, if (1) the plaintiff received the information from someone

who had received it from the defendant, and (2) the defendant intended the misrepresentation to

be conveyed to [the plaintiff]."  *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 348

(S.D.N.Y. 2010) (Gorenstein, Mag. J.) (quoting *Turtur v. Rothschild Registry Int'l Inc.*, 26 F.3d

304, 310 (2d Cir. 1994)).  Further, as the Second Circuit Court of Appeals has recognized, a

misrepresentation need not be repeated verbatim:  "a plaintiff may demonstrate reliance where

the third party does not directly repeat the defendant's misrepresentations to the plaintiff, *but*

*rather communicates them in a repackaged or summary form, on which the plaintiff then relied*."

*Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 77 (2d Cir. 2000) (emphasis

added).  *See also Arnold Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172, 189 (E.D.N.Y.

2006) (same); (Citi Br. at 26 n.15 (relying on RESTATEMENT (SECOND) OF TORTS § 533 (1977),

which states that "[t]he maker of a fraudulent misrepresentation is subject to liability for

19

pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved")).

The record evidence demonstrates that each of the Municipalities received the substance of Citigroup's misrepresentations from Terra, including: (a) the basis for the strategy of TOB Fund, *i.e.*, the arbitrage opportunity was purportedly based upon a mispricing in the municipal bond markets; (b) the effectiveness of the strategy, *i.e.*, it supposedly had a risk profile comparable to that of a direct investment in U.S. Municipal bonds and was thus safe; and (c) how the strategy would be implemented, *i.e.*, through the purchase of long term U.S. municipal bonds financed with short term debt. Moreover, some of the Plaintiffs received emails and the Norwegian Presentation which provided additional details about the FLNs and TOB Fund – information summarizing representations made in the Presentation. [SOF at ¶¶ 695-702] As Citigroup admits in its brief, "Terra . . . provide[d] Plaintiffs statements discussing the theory and merits of the investment . . ." as outlined in the Presentation. (Citi Br. at 25) This evidence supports the Municipalities' allegations of reliance.

The decision in *Indian Brand Farms, Inc. v. Novartis Crop Prot. Inc.*, 617 F.3d 207 (3d Cir. 2010), is instructive here. In *Indian Brand*, plaintiffs alleged, among other things, claims against defendant for fraud/negligent misrepresentation[9] based upon the defendant's representations and omissions in its marketing material about the safety and effectiveness of its new pesticide, AG600. *Id*. at 210-11. As a result of defendant's marketing efforts, Rutgers University ("Rutgers") scientists recommended AG600 to New Jersey farmers via a meeting and

---

[9] While the plaintiffs asserted such claims under New Jersey state law, there is no conflict with New York state law. *See, e.g.*, *id.* at 218; *Amusement Indus., Inc., supra*, 693 F. Supp. 2d at 348.

written bulletin they drafted and disseminated.  *Id*. at 211.  Following discovery, the defendant moved for summary judgment and the district court granted the motion, holding, among other things, that since the plaintiffs never received defendant's marketing materials, summary judgment was warranted.  *Id*. at 212.  Upon review, the Third Circuit reversed the district court as to certain plaintiffs, concluding that reliance had been satisfied.  *Id*. at 220.

Specifically, the Third Circuit focused on testimony given by Rutgers scientists who recommended AG600 at a meeting with farmers, stating that it was safer for the environment and all around a safer product.  The court also noted that the author of the bulletin which Rutgers had sent to farmers testified that he relied upon the defendants' marketing materials in publishing the bulletin and stating that AG600 was better for crop safety.  The plaintiffs also testified that as a result of the Rutgers recommendations and bulletin, they purchased AG600.  Based upon this evidence, the Third Circuit found that the plaintiffs had "made a sufficient showing that they indirectly relied upon the AG600 marketing brochure in making their decision to purchase or apply AG600."  *Id*. at 219-220.  As in *Indian Brand*, the Municipalities received from Terra both oral and written representations and recommendations based upon Citigroup's marketing materials as to the FLNs' safety, among other things.  Accordingly, Plaintiffs have adequately established reliance at this juncture.

Defendants also argue that the Municipalities cannot show reliance because of Terra's dissemination of various presentations translated into Norwegian.  Of course, Citigroup knew of the Norwegian Presentation, never disapproved of it and told Terra it accurately summarized the Presentation.  [SOF at ¶¶ 25, 694]  Further, although Citigroup claims the Norwegian Presentations materially altered its own marketing materials, Citigroup only points to boilerplate

cautionary statements in making this contention.  Such statements about what "may" happen in the future do not neutralize a failure to reveal significant historic risk information.

As this Court has already ruled – and consistent with the evidence in this case – Citigroup's general risk disclosures did not contradict or "inoculate the plausible marketing power" of the specific misrepresentations and omissions made to the unsophisticated Plaintiffs. *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441, 453 (S.D.N.Y. 2010) (Marrero, J.) ("*Terra I*").  *See also Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 496 (S.D.N.Y. 2001) (Sweet, J.) (sustaining a fraud claim where "the representations of low risk in other materials were linked with misrepresentations not contradicted by the PPMs . . . . [and] [t]he PPM risk disclosures did not contradict these more specific, alleged misrepresentations of past and present historical fact").  Citigroup's misrepresentations and omissions were not contradicted by Citigroup's cautionary warnings regarding "alternative investments" in general (and not the FLNs or TOB Fund specifically)."  *See, e.g., Caiola v. Citibank, N.A.*, 295 F.3d 312, 330 (2d Cir. 2002); *In re Prudential Sec. Ltd. P'shps Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (Pollack, J.) ("[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made").  Further, Citigroup's cautionary statement that the TOB Fund "may experience" substantial volatility was a blatant misrepresentation because Citigroup *knew* that the TOB Fund would experience substantial volatility.  As Dr. McCann, Plaintiffs' expert, has testified, it was Citigroup's specific, historical misrepresentations and omissions that led to Plaintiffs' losses, not the Presentation's boilerplate risk disclosures.  [SOF at ¶¶ 26]

Nevertheless, Citigroup argues that the New York Court of Appeals has held that indirect reliance cannot be maintained where an intermediary materially transforms information.  (*See*

Citi Br. at 25)  Of course, that did not happen here (and, if it did, Citigroup knew about it), and the Court of Appeals made no such broad statement.  In *Sec. Investor Prot. Corp. ("SIPC") v. BDO Seidman, L.L.P.*, 95 N.Y.2d 702, 723 N.Y.S.2d 750 (2001), the Court of Appeals merely held that the plaintiff could not "claim reliance on alleged misrepresentations *of which it was unaware even by implication*."  95 N.Y.2d at 710, 723 N.Y.S.2d at 755 (emphasis added).  This is clearly not the case here.  First, Citigroup completely ignores the oral communications in which Terra conveyed Citigroup's misrepresentations to the Municipalities.  [SOF at ¶¶ 695-702]  Second, Citigroup knew that the Norwegian Presentation was being disseminated to the Municipalities and did not prohibit Terra from doing so.  [SOF at ¶ 244][10]  At the very least, there are numerous disputed issues of material fact for trial here.  (*See* Citi Br. at 3 n.3)

Ultimately, Citigroup argues that Plaintiffs cannot establish reliance because Defendants never intended the sale of the FLNs to an unsophisticated investor.  (Citi Br. at 26-27)  However, as detailed above, Citigroup knew the Plaintiffs were the ultimate purchases of the FLNs, and clearly intended that the representations in the Presentation be conveyed to Plaintiffs.  *See, e.g., Ostano Commerzanstalt v. Telewide Sys., Inc*, 794 F.2d 763, 765-66 (2d Cir. 1986); *Amusement Indus., Inc., supra*, 693 F. Supp. 2d at 348.  Once again, at a minimum, disputed issues of material fact preclude summary judgment.

### B.  Citigroup's Numerous Omissions Also Support The Municipalities' Fraudulent Concealment Claim

Citigroup's motion focuses solely on the Municipalities' claims for fraudulent misrepresentation, conveniently overlooking Plaintiffs' fraudulent concealment claims. Plaintiffs' fraudulent concealment claims require proof of the same elements of a fraud claim as

---

[10]  Defendants' authorities are inapposite as they address when representations in a prospectus must be read "as a whole" to determine if the representations themselves were misleading.  *See, e.g., DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996); *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

discussed above, in addition to a duty to disclose material information.  *See Nomura Sec. Int'l, Inc. v. E\*Trade Sec., Inc.* 280 F. Supp. 2d 184, 204 (S.D.N.Y. 2003) (Sweet, J.).  A duty to disclose material facts arises "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993), *abrogated on other grounds by Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Nomura*, 280 F. Supp. 2d at 205 (same).  A duty to disclose also arises where a defendant "has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half the truth." *Brass*, 987 F.2d at 150 (citation omitted).

As noted above, Citigroup concealed critical information about the true nature of the TOB Fund, including, among other things, that it experienced significant volatility, its hedging strategy was ineffective, no real arbitrage opportunity existed and Plaintiffs were likely to sustain significant losses since they invested when the taxable and tax-exempt spreads were below historical averages.[11]  The Municipalities did not have any means of accessing Citigroup's proprietary information about the TOB Fund or the confidential Wyatt Report, research, models and analyses created by Citigroup's employees and consultants, and Citigroup clearly had vastly superior knowledge relative to the Municipalities and knew that the Municipalities were acting on mistaken knowledge.  Further, disclosure of Citigroup's omissions was necessary to correct the partial statements made by Citigroup, including that the TOB Fund involved mispricing, had a risk profile similar to U.S. municipal bonds and was a safe investment.  [SOF at ¶¶ 695-703]

Plaintiffs have repeatedly testified that they did not intend to invest in high-risk investments, and the evidence demonstrates that the Municipalities would not have invested in

---

[11]  The reliance element of Plaintiffs' fraudulent concealment claim, like its fraudulent misrepresentation claim, can be sustained indirectly.  *See, e.g.*, *Samuels v. Fradkoff*, 2005 N.Y. Misc. LEXIS 3610, at \*6-7 (Sup. Ct. Aug. 10, 2005).

the FLNs had they been apprised of the critical information withheld by Citigroup.  [SOF at ¶¶ 664-669]  *See, e.g., Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 175, 182 (2d Cir. 2007) (summary judgment reversed where "critical" "facts" peculiarly within appellee's knowledge "may have played a part in [appellant]'s decision to purchase" company, and appellant could have reasonably relied where circumstances surrounding preparation and delivery of financial summaries were not revealed); *O'Brien v. Citizens Ins. Co. of Am.*, 2007 N.Y. Misc. LEXIS 5685, at *27 (Sup. Ct. Aug. 6, 2007) (fraudulent concealment claim sustained where defendant represented to plaintiff that entering premises was "safe," because plaintiff testified that she would not have entered premises if she had known what defendants omitted to tell her "the true nature of the chemical compounds present").

The circumstances here are analogous to those in *Schwarz v. ThinkStrategy Capital Mgmt. LLC*, 2012 U.S. Dist. LEXIS 79453 (S.D.N.Y. May 31, 2012) (Engelmayer, J.).  In *Schwarz*, defendants, a "fund of funds" and its managing director, were found liable to plaintiff investors for fraudulently concealing information about the due diligence they had conducted on the hedge funds in which they were investing.  *Id.* at *2-3.  Through an offering memorandum, marketing presentation and conversations with plaintiffs, defendants made various representations which influenced plaintiffs' decision to invest, including that the fund strategy was "designed to produce stable absolute returns . . . .," to "deliver[] superior rates of return while preserving capital," had a "low correlation to stocks and bond markets," and excluded funds whose managers had inadequate backgrounds, and that "risk control [was] central to all investment activities."  *Id.* at *7-9.  Following a bench trial, the court "readily conclude[d]" that the requirements of materiality, reliance and injury were met with respect to the defendants' concealment of the fact that they were not carrying out due diligence in a manner consistent with

25

their representations to plaintiffs. *Id.* at *43-47. Citigroup is likewise liable to the Municipalities for the omissions which caused Plaintiffs to invest in the TOB Fund.

Based upon Citigroup's superior knowledge, proprietary data and Plaintiffs' inability to readily discover Citigroup's concealed information, Citigroup owed the Plaintiffs a duty to disclose these omissions.

**C.    The Municipalities Also Relied On The Advice Of Terra**

The Municipalities also relied on the advice of Terra, which, as an agent to Plaintiffs, relied on Citigroup's misrepresentations in recommending the FLNs. [SOF at ¶ 685] Citigroup concedes that a fraud claim by a principal (the Municipalities) can be based on reliance on an agent (Terra) (Citi Br. at 28), but invokes this Court's ruling in *Terra I*, *supra*, 740 F. Supp. 2d 441, *aff'd,* 450 Fed. Appx. 32 (2d Cir. 2011), for the proposition that this Court's findings regarding Terra's unreasonableness should be imputed to the Municipalities.

However, *Terra I* was a ruling based on Terra's status as a plaintiff seeking damages, and the case law that Citigroup cites regarding reasonable reliance by an agent is based on a single agency relationship. *See In re Beacon Assocs. Litig.,* 745 F. Supp. 2d 386 (S.D.N.Y. 2010) (Sand, J.). Here, the facts are more complicated: Terra had a dual role, in that it had also been retained by Citigroup and was acting as a Citigroup agent pursuant to Citigroup's dictates with respect to how the FLNs were to be marketed. Citigroup is liable for the misrepresentations and omissions communicated to the Municipalities through Terra, and cannot now rely on the "unreasonableness" *of its own agent* to escape liability here.

First, although Citigroup contends that it is not rearguing this Court's decisions in October 2011 (*see* Order, Oct. 14, 2011, [Dkt. No. 95] Decision and Order, Oct. 20, 2011 [Dkt. No. 99], collectively, "10/11 Orders") – which orders rejected Citigroup's effort to impute Terra's sophistication to the Municipalities – that is exactly what Citigroup is doing. Citigroup

wants to relitigate the 10/11 Orders and have this Court now find that Terra's

"unreasonableness" as a plaintiff (in this context, just another way of saying "sophistication")

should be imputed to the Municipalities from showing reliance.  The doctrine of law of the case

precludes such a result.[12]

Second, even if principles of imputation could theoretically be applied here (which they

cannot), a well established exception to those principles would preclude Defendants' reliance on

imputation as a defense:

> It is universally accepted that "the rule imputing an agent's knowledge to the
> principal is designed to protect only those who exercise good faith, and is not
> intended to serve as a shield for unfair dealing by the third person. The rule may
> not be invoked where third persons use the agent to further their own frauds upon
> the principal . . ." *Agency*, 3 Am.Jur.2d § 295.[13]

*First Alabama Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1060 n.8 (11th

Cir. 1990).  *See also First Nat'l Bank of Cent. Ala. v. Moore*, 2010 Bankr. LEXIS 1529, at *43

(Bankr. N.D. Ala. May 6, 2010) (noting the exception to imputation where a third-party is not

innocent and holding that "[b]ecause the Debtor [third-party] misrepresented a material fact and

was a party to the deception perpetrated on FNB [principal], he cannot now claim that he should

not be held accountable for his actions because FNB [through its agent] knew or had reason to

know that it was being lied to") (citation omitted); *Sport Motorcycle Center v. Colonia Ins. Co.*,

227 A.D.2d 335, 335, 643 N.Y.S.2d 59, 60 (1st Dep't 1996) ("The rule which imputes an agent's

knowledge to his or her principal is intended to protect those who exercise good faith . . .")

(quotations omitted).  Accordingly, imputation may not be invoked "where third persons use the

---

[12]  *See Robinson v. Sanctuary Record Groups, Ltd.*, 249 F.R.D. 144, 146 (S.D.N.Y. 2008) (Marrero, J.) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons" . . .) (citation omitted); *In re Northern Telecom Ltd. Sec. Litig.*, 42 F. Supp. 2d 234, 239-40 (S.D.N.Y. 1998) (Dolinger, J.) (declining to revisit prior denial of motion to dismiss under the law of the case doctrine which posits that when a court decides upon a rule of law, that decision should continue to govern in subsequent stages of the same case).

[13]  The rule can now be found at 3 Am. Jur. 2d Agency §284 (2011).

agent to further their own frauds upon the principal," and Defendants "cannot use agency law's constructive knowledge rule to shield itself from liability for its fraudulent misrepresentation." *In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1319 (S.D. Fla. 2002) (quoting *First Alabama*, 899 F.2d at 4060 n.8).

Third, Citigroup was the principal in its agency relationship with Terra.  It is axiomatic that where, like here, a principal (Citigroup) misleads an agent (Terra), the principal is liable for the agency's subsequent misrepresentations.  *See Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1222 (9th Cir. 1999) ("[A] principal who deliberately withholds material facts from his agent in order that the agent may innocently misrepresent the facts is guilty of fraud if the agent does in fact make such a misrepresentation and it is relied on by the third party") (citation omitted); *In re Manzanares*, 345 B.R. 773, 793 (Bankr. S.D. Fla. 2006) ("A principal is obligated to provide an agent with adequate instructions and warnings, and a principal may be held responsible for harm which results from the failure to disclose known facts to the agent"); *Abbate v. Abbate*, 82 A.D.2d 368, 378-81, 441 N.Y.S.2d 506, 512-14 (2d Dep't 1981) (holding principal could be liable for misrepresentations communicated by an innocent agent and quoting RESTATEMENT (SECOND) OF AGENCY § 256 cmt. b); RESTATEMENT (SECOND) OF AGENCY § 256 cmt. b (1958) ("If a principal, knowing that an agent is about to conduct a transaction with inadequate or misleading information, *intentionally withholds information from him for the purpose of enabling the agent honestly to misstate facts, the principal is subject to liability as for his own fraudulent statement if the agent subsequently does misstate such facts")* (emphasis added).

Although Citigroup points to the Distribution Agreements in attempt to disavow the existence of any agency relationship with Terra, as the Plaintiffs have previously demonstrated to the Court, the disclaimer provisions in the Distribution Agreements are not dispositive with

regards to Citigroup and Terra's role with respect to the FLNs.  *See, e.g.*, *Bd. of Trade of City of Chi. v. Hammond Elevator Co.,* 198 U.S. 424, 437 (1905) ("The fact, however, that the relations between the defendant and its correspondents are, as between themselves, expressly disclaimed to be those of principal and agent, is not decisive of their relations so far as third parties dealing with them upon the basis of their being agents are concerned"); *In re Shulman Transp. Enter., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984) ("[W]here the public interests or the rights of third parties are involved, the relationship between contracting parties must be determined by its real character rather than by the form and color that the parties have given it").

### 1.     Citigroup Is Estopped From Denying Terra's Agency

In many respects, the circumstances here are similar to those which arise in the context of apparent authority.  Even where a party may not be authorized to act as an agent, apparent authority can estop defendants like Citigroup from denying agency as against third parties like the Municipalities. To establish apparent authority, a plaintiff need only show that:  (a) the principal "was responsible for the appearance of authority in the agent" and (b) the "third party's reliance on apparent authority was reasonable."  *Merrill Lynch Capital Servs. v. UISA Fin.*, 2012 U.S. Dist. LEXIS 51109, at *20 (S.D.N.Y. Apr. 10, 2012) (quotations omitted).  Moreover, apparent authority does not require actual contact between the principal and third party.  *See Chem. Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 130 (2d Cir. 1999).  Here, the record evidence amply demonstrates that:  (a) Citigroup affirmatively picked Terra to be its representative in Norway, and directed how Terra was to market the FLNs to the Municipalities and (b) it was completely reasonable for the Municipalities to view Terra as Citigroup's agent in selling the FLNs.  [SOF at ¶¶ 679, 686-94]

In fact, the Second Circuit has recognized that an agency relationship arises where, like here, the principal remains silent in the face of the agent's actions when the principal knew or

ought to have known the silence would be relied upon.  *See Scientific Holding Co. v. Plessey, Inc.*, 510 F.2d 15, 25 (2d Cir. 1974).  Accordingly, Citigroup is estopped from denying Terra's agency with Citigroup where, like here, Citigroup knew how Terra was marketing the FLNs, knew who was purchasing the FLNs, and accepted Plaintiffs' investments into the TOB Fund while failing to repudiate Terra's purportedly unauthorized acts.  *See id.* at 26 (finding apparent authority where "Scientific could not simply sit by until mid-July, keeping the consideration it had received and allowing Plessey to invest substantial additional funds in the ISL business, and then assert that the amendment on which Plessey had relied . . . had not been authorized").  *See also Trs. of the Am. Fed'n of Musicians & Employers' Pension Fund v. Steven Scott Enters., Inc.*, 40 F. Supp. 2d 503, 511 (S.D.N.Y. 1999) (Motley, J.) ("[T]he court concludes that the Pension Fund's acts of continually cashing all fifteen settlement checks while failing to repudiate Moriarity's unauthorized actions after receiving notice of at least seven settlement agreements created the appearance of authority that Steven Scott reasonably relied on").

Because Citigroup required that Terra rely only upon the misrepresentations contained in its Presentation to the Plaintiffs, and received a copy of the Norwegian Presentation communicating many of those misrepresentation, Citigroup obviously knew that Plaintiffs would receive those misrepresentations.  [SOF at ¶¶ 686-694]  While Citigroup claims Terra's acts were unauthorized, the record evidence demonstrates that Citigroup never communicated any disagreement to Terra or withheld any necessary authorizations.  [SOF at ¶¶ 693-94]  Instead, Citigroup perpetuated the situation by, among other things:  (a) continuing to manage the Municipalities' investments; (b) collecting its management fees; (c) accepting the Municipalities' substantial investments in the TOB Fund; and (d) accepting additional collateral payments from,

and entering into additional collateral agreements with, the Starling Plaintiffs as to keep those Municipalities invested in the FLNs.  [SOF at ¶¶ 704-05]

## 2.    Citigroup Ratified Terra's Acts As Agent

The doctrine of ratification is also useful here. While ratification "must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language," *Chem. Bank*, *supra*, 169 F.3d at 128, it can be shown by the "the acceptance of the benefits of the agent's misdeeds, with knowledge." *Orix Credit All. v. Phillips-Mahnen, Inc.*, 1993 U.S. Dist. LEXIS 7071, at *16 (S.D.N.Y. May 26, 1993) (Katz, Mag.J.).  Further a "principal's silence or acquiescence in the face of knowledge of an unauthorized act can also constitute ratification of the act." *Amusement Indus. v. Citigroup Global Markets Realty Corp. (In re First Republic Group Realty, LLC)*, 421 B.R. 659, 683 (Bankr. S.D.N.Y. 2009) (citations omitted).

Here, Citigroup affirmatively ratified Terra's acts by accepting the significant benefits flowing from the sale of the FLNs, even though Citigroup knew Terra had not conducted independent due diligence, was marketing and selling the FLNs to the Plaintiffs based on the materials provided by Citigroup, and was distributing the Norwegian Presentation.  [SOF at ¶¶ 686-94] *See, e.g.*, *Miller v. Premier Corp.*, 608 F.2d 973, 978-80 (4th Cir. 1979) (finding ratification where principal knew that agent disregarded its instruction and provided investor with a modified pro forma statement and representations not included in the principal's prospectus); *In re First Republic Group Realty*, *supra*, 421 B.R. at 684 ("[Defendant] cannot have its cake and eat it too – it cannot welcome the benefits of an operative transaction without recognizing the transaction as an operative transaction.  [Defendant's] attempt to cash in on the potential windfall associated with the transaction constituted a ratification of the transaction"); *IRB-Brazil Resseguros, S.A. v. Inepar Invs., S.A.*, 83 A.D.3d 573, 575, 922 N.Y.S.2d 308, 311

(1st Dep't 2011) ("IIC's acceptance of benefits flowing from an agreement that it now asserts was unauthorized when executed constitutes an affirmance of the agreement giving rise to a ratification").

### III. Citigroup's Misrepresentations And Omissions Directly And Proximately Caused Plaintiffs' Injuries

Citigroup next contends that Plaintiffs cannot prove causation as a matter of law because Terra's acts – *i.e.* marketing the FLNs to unsophisticated Plaintiffs, distributing the Norwegian Presentation to the Plaintiffs, and informing the Plaintiffs that the FLNs were a "low risk" investment – are supposedly intervening acts which, as a matter of law, proximately caused Plaintiffs' losses and cut off Citigroup's liability.[14]  (Citi Br. at 29-30)  However, Citigroup knew about and acquiesced to these acts.  [SOF at ¶¶ 680-82, 686-94, 695, 700]  Under New York law, Citigroup can be "found to have proximately caused the [Plaintiffs'] injur[ies] if the intervening act was normal or foreseeable," *Woodling v. Garrett Corp.*, 813 F.2d 543, 555-56 (2d Cir. 1987) (rejecting the broad proposition that intermediary's failure to pass on a warning relieves manufacturer of liability as a matter of law); *Adebiyi v. Yankee Fiber Control, Inc.*, 705 F. Supp. 2d 287, 291-92 (S.D.N.Y. 2010) (Sullivan, J.) (same), and, generally, the issue of whether an intervening act breaks the causal nexus is for the trier of fact, *Derdiarian v. Felix Contractor Corp.*, 51 N.Y.2d 308, 314-15, 434 N.Y.S.2d 166, 169 (1980); *Sweeney v. Bruckner Plaza Assoc.*, 57 A.D.3d 347, 348, 869 N.Y.S.2d 453, 454-55 (1st Dep't 2008), and not for resolution on summary judgment.

---

[14] Citigroup principally relies on *Mausarra ex rel. Beninati v. Yamaha Motor Co.*, 178 Misc. 2d 941, 680 N.Y.S.2d 793 (Sup. Ct. 1998), in arguing Terra's acts insulate it from liability.  However, *Mausarra*, is inapposite.  First, the warnings there, unlike here, warned against the specific harm at issue.  178 Misc. 2d at 943, 680 N.Y.S.2d at 795.  Second, the plaintiffs there, unlike here, failed to heed the warnings which the court found broke the causal nexus attributable to the defendants.  178 Misc. 2d at 943-44, 680 N.Y.S.2d at 795.  Third, the court found it unforeseeable that a dealership would violate a consent decree and risk termination of its dealership agreement.  178 Misc. 2d at 946, 680 N.Y.S.2d at 796.  As detailed below, Terra's actions were foreseeable because Citigroup knew that Terra was selling FLNs to the Plaintiffs, Terra would convey to the Plaintiffs that the FLNs were "low risk" and Terra would distribute the Norwegian marketing materials to the Plaintiffs.

As discussed above, it was not only foreseeable that Terra would market the FLNs to Plaintiffs, *Citigroup actually knew that Terra would do so*.  Moreover, given the specific misrepresentations in the Presentation portraying the FLNs as a low risk investment, and the Distribution Agreements' requirement that Terra use the Presentation, it was also foreseeable that Terra would describe the investments as such to the Plaintiffs.  Lastly, since Terra provided Citigroup with a copy of the Norwegian Presentation (which did not include a translated version of the boilerplate cautionary statements), and Citigroup never objected to its distribution to the Plaintiffs, Citigroup could also reasonably foresee that Terra would distribute that Presentation to the Municipalities.  Indeed, the Norwegian Presentation highlighted different risk disclosures, which were consistent with Arnold and Hafsteen's representations to Terra.

## IV.   Defendants Have Failed To Demonstrate That Plaintiffs' Negligent Misrepresentation Claims Should Be Dismissed

Finally, contrary to Citigroup's assertions, Plaintiffs are not required to show they had a relationship of privity with Citigroup to prevail on their negligent misrepresentation claim.  (Citi Br. at 31)  Rather, the Municipalities may prevail on this claim by establishing:

> (1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance.

*Terra I*, *supra*, 740 F. Supp. 2d at 456 (citing *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 443 (N.Y. 1985)).  *See also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 416 (S.D.N.Y. 2010) (Marrero, J.).  Moreover, "[i]n negligent misrepresentation claims based on omissions, New York recognizes a duty by a party to a business transaction to speak . . . where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Creative Waste Mgmt. v. Capitol Envtl. Servs.*, 429 F. Supp. 2d 582, 609 (S.D.N.Y. 2006)

(Conner, J.) (citation omitted).  Plaintiffs have ample evidence supporting such a negligent misrepresentation claim which, at the very least, presents a genuine issue of material fact.

First, it is uncontested that Citigroup intended for its representations in the Presentation to be used to induce investments in the FLNs.  Second, contrary to Defendants' repeated assertions otherwise, record evidence demonstrates that Citigroup knew that the FLNs were being sold to the Municipalities.[15]  Third, Citigroup not only insisted that its representations be conveyed to the Municipalities, it was well aware that it was being done in a repackaged form.  [SOF at ¶¶ 682, 686-94]  Once again, there is no need for the Municipalities to have read every word of the Presentation; it is sufficient that material, misleading representations were conveyed to Plaintiffs and that critical information was omitted from the Presentation.  *See, e.g.*, *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 425, 541 N.Y.S.2d 335, 339 (1989) (finding sufficient support for negligent misrepresentation claim where "defendants were aware . . . that *the substance of the reports they furnished* would be transmitted to and relied upon by" the plaintiff) (emphasis added).  Lastly, as noted above, the facts clearly establish that Citigroup: (a) had vastly superior knowledge of U.S. municipal bond markets, the TOB Fund and the FLNs, as well as access to data (including, for example, the Wyatt Report) that was not readily available to the Municipalities; and (b) knew the Municipalities were investing on the basis of mistaken knowledge.  [SOF at ¶¶ 572, 575-660]

---

[15]  Defendants' reliance on *Sykes v. RFD Third Ave. 1 Assocs., LLC*, 15 N.Y.3d 370, 912 N.Y.S.2d 172 (2010) and *Westpac Banking Corp. v. Deschamps*, 66 N.Y.2d 16, 494 N.Y.S.2d 848 (1985) is misplaced.  (*See* Citi Br. at 32)  In neither case did the plaintiffs have evidence showing that the defendant had specific knowledge of the plaintiffs' identity.  Moreover, many courts, including this one, have rejected the proposition that a defendant must know the exact identity of the plaintiff under the *Credit Alliance* test.  *See, e.g.*, *Anwar*, *supra*, 728 F. Supp. 2d at 456.

## <u>CONCLUSION</u>

For the foregoing reasons, Citigroup's motion for summary judgment should be denied in its entirety.

Dated:  New York, New York
         July 16, 2012

                                    Respectfully submitted,

                                    KASOWITZ, BENSON, TORRES
                                     & FRIEDMAN LLP


                                    By:   s/ Michael M. Fay
                                          Michael M. Fay (mfay@kasowitz.com)
                                          Christine A. Montenegro (cmontenegro@kasowitz.com)
                                          Kim Conroy (kconroy@kasowitz.com)
                                          Jenny H. Kim (jkim@kasowitz.com)


                                    1633 Broadway
                                    New York, NY 10019
                                    (212) 506-1700

                                    *Attorneys for Plaintiffs*